IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

APPEAL NO.
L.T. NO. 6:19-CR-241-ORL-37DCI

_____

IN RE:  VINCE EDWARD LASANE,

Petitioner

_____

THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

_____

PETITION FOR A WRIT OF MANDAMUS TO THE
ELEVENTH CIRCUIT COURT OF APPEALS
WITH APPENDIX IN SUPPORT

_____

JAMES T. SKUTHAN
Acting Federal Defender

JOSHUA R. LUKMAN
Assistant Federal Defender
FL Bar Number: 0088213
201 S. Orange Ave., Ste. 300
Telephone: 407-648-6338
joshua_lukman@fd.org
Counsel for Petitioner

ALI KAMALZADEH
Assistant Federal Defender
FL Bar Number 115995
201 S. Orange Ave., Ste. 300
Telephone: 407-648-6338
ali_kamalzadeh@fd.org
Counsel for Petitioner

Appeal No.

*In Re:  Vince Edward Lasane*

CERTIFICATE OF INTERESTED PERSONS

The persons listed below have an interest in the outcome of this case:

Dalton, Jr., The Honorable Roy B.

Gable, Karen L.

Irick, The Honorable Daniel C.

Kamalzadeh, Ali

Kidd, The Honorable Embry J.

Lasane, Vince Edward

Lukman, Joshua R.

Reyes, Karla Mariel

Skuthan, James T.

Smith, The Honorable Thomas B.

Sweeney, Sara C.

C 1 *of* 2

Appeal No.

*In Re:  Vince Edward Lasane*

CERTIFICATE OF INTERESTED PERSONS – *CONT'D*

No publicly traded company or corporation has an interest in the outcome of this appeal.

C 2 *of* 2

# TABLE OF CONTENTS

Certificate of Interested Persons ............................................................ C1

Table of Authorities...................................................................................ii

Relief Sought ............................................................................................ 1

Issues Presented........................................................................................ 1

Facts Necessary to Understand the Petition............................................ 1

Reason For Granting the Writ ................................................................. 4

    I.    The Court should direct the district court to continue the trial to protect the health and safety of the public and all parties involved in these federal proceedings to in the midst of this unprecedented pandemic ...................................... 4

        a. There are no other adequate means of relief ........................ 6

        b. The right to a writ is clear and undisputable ....................... 8

        c. A writ is appropriate under the circumstances ................... 14

Conclusion ............................................................................................ 20

Certificate of Compliance with Type-Volume Limit.............................. 21

Certificate of Service .............................................................................. 21

Appendix

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Cheney v. U.S. Dist. Court for Dist. Of Columbia,*

   542 U.S. 367 (2004)...................................................................5

*Faour Abdallah Fraihat v. United States Immigration &*

   *Customs Enf't*, No. EDCV 19-1546 JGB (SHKx), 2020 UL

   1932570 (C.D. Cal. Apr. 20, 2020).......................................15

*Gandy v. Alabama*, 569 F.2d 1318 (5th Cir. 1978)................................12

*In Re Sec'y, Fla. Dep't of Corrs.,* No: 20-10650-J, 2020 WL

   1933170 (11th Cir. Mar. 30, 2020) ........................................8

*In re Wellcare Health Plans, Inc.*, 754 F.3d 1234 (11th Cir. 2014) ..........5

*In Re: Coronavirus Public Emergency*, No. 6:20-mc-00017-RBD

   (M.D. Fla.)....................................................................2, 3, 9

*In Re: Sec'y, Fla. Dep't. of Corrs.,* No: 20-10650-J, 2020 WL

   1933170 (11th Cir. Mar. 20, 2020) ........................................5

*Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999

   (11th Cir. 1997)....................................................................5

*Matter of Sandahl*, 908 F.2d 1118 (7th Cir. 1992) ..................................8

*Morris v. Slappy*, 461 U.S. 1 (1983) ........................................................8

**Cases**                                                            **Page(s)**

*Ochoa v. Kolitwenzew*, No. 20-cv-2135, 2020 WL 2850706

   (C.D. Ill. June 1, 2020) ......................................................................... 16

*People First of Ala. v. Sec'y of State for Ala.,* No. 20-12184,

   2020 WL 3478093 (11th Cir. June 25, 2020) ...................................... 15

*United States v. Baker*, 432 F.3d 1189 (11th Cir. 2005)..................... 8, 12

*United States v. Breslin*, No. 16-cr-00515-YGR-1, 2020 WL

   4584244 (N.D. Cal. Aug. 10, 2020) ..................................................... 15

*United States v. Chopra*, No. 18-CR-20668-MIDDLEBROOKS,

   2020 WL 4333507 (S.D. Fla. July 24, 2020)....................................... 15

*United States v. Kelly*, No. 3:13-CR-59-CWR-LRA-2, 2020 WL

   2104241 (S.D. Miss. May 1, 2020)....................................................... 14

*United States v. Ramos*, No. 16-CR-826 (PAE), 2020 WL

   3642050 (S.D.N.Y. July 6, 2020) ......................................................... 14

*United States v. Verderame*, 51 F.3d 249 (11th Cir. 1995)...................... 9

*Will v. United States*, 389 U.S. 90 (1967) ................................. 5, 8, 10, 19

**Statutes**                                                         **Page(s)**

U.S. Const. amend VI............................................................................... 12

28 U.S.C. § 1651(a) ................................................................................... 4

**Rule(s)**                                                                **Page(s)**

Model Rules of Prof'l Conduct R. 1.4 ..................................................... *12*

## RELIEF SOUGHT

Petitioner Vince Edward Lasane respectfully requests that the Court grant this petition for writ of mandamus directing the district court below to continue his jury trial for 60 days to protect the health and safety of the public and all parties involved in the proceedings below amid this unprecedented pandemic.

## ISSUES PRESENTED

(1) Whether the district court abused its discretion in refusing to continue Mr. Lasane's jury trial, which is currently scheduled to begin on September 8, 2020.

(2) Whether the Court should direct the district court to continue the jury trial below when such a proceeding puts the health and safety of the parties and public involved with this trial at high risk amid a worldwide health crisis.

## FACTS NECESSARY TO UNDERSTAND THE PETITION

A grand jury returned a two-count indictment on November 13, 2019.  Doc. 6.[1]  The district court set a jury trial to begin on March 2,

---

[1] Mr. Lasane's underlying district court proceeding, No. 6:19-cr-241-Orl-37DCI, will be cited as "Doc. ___."

1

2020.  Doc. 27.  Shortly before the original trial date, the government filed
an emergency motion to continue the trial because one of their essential
trial witnesses contracted the flu.  Doc. 41.  The district court conducted
a hearing on February 28, 2020, and without opposition from Mr. Lasane,
the district court granted the motion and rescheduled the trial to begin
on March 31, 2020.  Docs. 44, 45.

On March 18, 2020, the district court issued an order continuing all
jury trials beginning before June 30, 2020, in the Orlando division due to
the   Centers   for   Disease   Control   and   Prevention's   (CDC)
recommendations to reduce exposure to the coronavirus (COVID-19).  *See
In Re: Coronavirus Public Emergency*, No: 6:20-mc-00017-RBD, Doc. 1
(M.D. Fla. Mar. 18, 2020).  That same day, the district court conducted a
telephonic conference in Mr. Lasane's case and cancelled the March 31,
2020, trial date based upon the earlier emergency order.  Doc. 49.  Due to
the worsening pandemic, the district court issued an order on May 29,
2020, continuing the trial to the July 2020 trial term.  Doc. 50.  With
COVID-19 numbers still high, the district court rescheduled the trial to
begin on August 10, 2020, after conducting a conference on June 11, 2020.
Doc. 54.  On July 6, 2020, the court again rescheduled the trial to begin

on September 8, 2020, after adopting the omnibus order in *In Re: Coronavirus Public Emergency*, 6:20-mc-0017-RBD, Doc. 4 (M.D. Fla. Jul. 1, 2020).  Docs. 59, 60.

After Mr. Lasane exhibited some symptoms of coughing and voice hoarseness, defense counsel filed a motion to continue the trial for 60 days due to the health and safety concerns of an in-person trial.  Doc. 61. Alongside the motion, Mr. Lasane filed a declaration from Dr. Eric Lofgren, an epidemiologist currently engaged in COVID-19 research funded by the CDC, who emphasized the substantial risk of COVID-19 transmission in a courtroom, noting that the six-foot distance recommendation is not intended for "long, sustained contact" like a federal criminal jury trial.  Docs. 61, 61-1 at 7.  Counsel for Mr. Lasane noted the conditions at the Seminole County Jail (SCJ) greatly hindered counsel's ability to meet with Mr. Lasane: counsel was allowed only one 30 minute phone call per day subject to availability or in-person visits in the SJC's "bond room" replete with correctional officers and other visitors.  Doc. 61 at 3–4.  Counsel also noted that he lives with two individuals with underlying health conditions that increased their risks from the deadly COVID-19 virus.  *Id.* at 5.

At the status conference on August 20, 2020, the district court indicated it believed the public's "right to a speedy trial" outweighed Mr. Lasane's concerns because "indefinitely continuing jury trials is simply not an option." *See* Doc. 64 at 8–9. [2] The court then denied the motion in an endorsed order that did not address any of Mr. Lasane's concerns regarding the pandemic, violations of Mr. Lasane's constitutional rights to counsel, or the risks to others. Doc. 63.

It is against this backdrop that Mr. Lasane now seeks a writ of mandamus from the Court.

## WHY THIS COURT SHOULD GRANT MR. LASANE'S PETITION

## I.   The Court should direct the district court to continue the trial to protect the health and safety of the public and all parties involved in these federal proceedings to in the midst of this unprecedented pandemic.

This Court is authorized to issue a writ of mandamus pursuant to 28 U.S.C. § 1651(a). A writ is a "'drastic and extraordinary remedy reserved for really extraordinary causes' amounting to a 'judicial

---

[2] The government did not explicitly oppose Mr. Lasane's motion to continue, stating "[we] understand defense counsel's issues. But we have been prepared, and we are ready to go. You know, [we] have agents that are witnesses in the case. So in terms of loss of evidence or any of those, [we] can't say that the Government is prejudiced because of this. Doc. 64 at 2.

usurpation of power' or a 'clear abuse of discretion.'" *In re Wellcare Health Plans, Inc.*, 754 F.3d 1234, 1238 (11th Cir. 2014); *see Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1004 (11th Cir. 1997). Because a writ of mandamus is "one of the most potent weapons in the judicial arsenal," W*ill v. United States*, 389 U.S. 90, 107 (1967), three conditions must be met before a writ of mandamus is issued: (1) the "party seeking issuance of the writ must have no other adequate means to attain the relief he desires," thus ensuring that the writ does not replace the regular appeals process; (2) the petitioner must show his right to issuance of a writ is "clear and indisputable; and (3) "the issuing court . . . must be satisfied the writ is appropriate under the circumstances." *Well Care Health Plans*, 754 F.3d at 1238 (citing *Cheney v. U.S. Dist. Court for Dist. Of Columbia*, 542 U.S. 367, 380–81 (2004). Though these standards are high, the Court has granted petitions for a writ as recently as March of this year. *See In Re: Sec'y, Fla. Dep't. of Corrs.,* No: 20-10650-J, 2020 WL 1933170 (11th Cir. Mar. 20, 2020) (granting a writ of mandamus compelling the district court to enter an order granting a motion for entry of a protective order).

As shown below, Mr. Lasane meets these high standards.

### a. There are no other adequate means of relief.

Mr. Lasane previously requested that the district court continue his jury trial for 60 days, which the court denied in an endorsed order. Docs. 61, 63. Though the order provided no explanation at the status hearing on August 20, 2020, the district court prioritized the trial schedule over the protection of Mr. Lasane, his defense team, courthouse personnel, and the public. *See* Doc. 64.

Mr. Lasane has no remedy on appeal or other means of relief.[3] The district court has pushed a September 8, 2020, trial date, despite significant evidence that the COVID-19 virus has infected over 5.7 million persons in this country, killing at least 176,000.[4] Though Mr. Lasane has provided evidence that it is not yet safe to conduct a jury trial in September, the district court has eschewed Mr. Lasane's evidence and determined that an in-person jury trial is appropriate in the throes of the a deadly pandemic.

---

[3] On August 25, 2020, Mr. Lasane renewed his motion to continue in the district court based on new information.

[4] Sergio Hernandez, Sean O'Key, Amanda Watts, Bryon Manley, Henrik Pettersson, CNN, *Tracking Covid-19 cases in the US*, available at https://www.cnn.com/interactive/2020/health/coronavirus-us-maps-and-cases/ (last updated August 25, 2020).

Earlier this year, the district court recognized the unprecedented danger presented by the pandemic—by first canceling the jury trial and then continuing it for several months. *See* Docs. 49, 50, 54, 59. But when Mr. Lasane asked to continue the trial for 60 days—to confer with his client, ensure his client is not sick, and guarantee sustained improvement of the pandemic numbers—the court misconstrued the request as asking to "indefinitely" postpone the trial, thereby hindering the public's "right to a speedy trial." Doc. 64 at 8–9.

Neither the court, nor the government, has provided any evidence that the precautions the court will take at trial on September 8, 2020, will actually provide any protection from the virus. Nor have either shown why it is safer to conduct an in-person trial now, when COVID-19 infection and death rates are substantially higher than March 2020.[5] Unless the trial is continued, Mr. Lasane, defense counsel, and all those in the courtroom on September 8, 2020, will be subjected to an enclosed

---

[5] The United States reported nearly 46,000 new cases of COVID-19 on August 23, 2020. In contrast, there were about 3,500 cases on March 18, 2020, when the district court first cancelled Mr. Lasane's trial. *See* John Elflein, Statista, *Number of U.S. coronavirus (COVID-19) cases from Jan. 22 to August 23, 2020, by day* (August 24, 2020) available at https://www.statista.com/statistics/1102816/coronavirus-covid19-cases-number-us-americans-by-day/.

environment that could prove deadly as there is no vaccine or cure should anyone contract the virus.

### b. The right to a writ is clear and indisputable.

The party seeking mandamus has the burden of demonstrating that his right to issuance of a writ is clear and indisputable. *Will*, 389 U.S. at 96. The moving party must show that the district court was "patently erroneous," *Matter of Sandahl*, 908 F.2d 1118, 1121 (7th Cir. 1992), and that the district court clearly abused its discretion. *See In Re Sec'y, Fla. Dep't of Corrs.,* No: 20-10650-J, 2020 WL 1933170, at *2 (11th Cir. Mar. 30, 2020) ("[P]etitioner has demonstrated that its right to the writ is clear and indisputable because the district court clearly abused its discretion in denying the motion for a protective order.").

In this case, Mr. Lasane's right to a writ is clear as the district court clearly abused its discretion in refusing to continue Mr. Lasane's trial. *See United States v. Baker*, 432 F.3d 1189, 1248 (11th Cir. 2005) (reviewing the denial of a motion to continue for abuse of discretion). While a court has broad discretion in scheduling trials, *see Morris v. Slappy*, 461 U.S. 1, 11 (1983), compelling reasons—including the amount of time a defendant has to prepare for trial, the likelihood of prejudice

8

from denial, the complexity of the case, and the public interest, including inconvenience to the district court—may justify a continuance. *See United States v. Verderame*, 51 F.3d 249, 251 (11th Cir. 1995). Determining when the denial of a continuance would be "so arbitrary as to violate due process" involves a case-specific inquiry, focusing on the rationales cited by the party seeking the continuance. *Id*.

Compelling reasons support Mr. Lasane's request to continue the trial for 60 days. The court previously continued the trial proceedings for similar reasons. It granted the government's motion to continue when a government witness contracted the flu, another contagious respiratory illness.[6] *See* Doc. 41. And since March, the district court has continued the trial in this case and others because of the highly dangerous nature of the COVID-19 virus. *See* Docs. 49, 50, 54, 59; *see also In Re: Coronavirus Public Emergency*, No. 6:20-mc-00017-RBD  (M.D. Fla.). The circumstances regarding COVID-19 have only worsened, not improved, since then. Doc. 61.

---

[6] CDC, *What is the difference between Influenza (Flu) and COVID-19*, available at https://www.cdc.gov/flu/symptoms/flu-vs-covid19.htm (last visited August 25, 2020).

COVID-19 is currently the third leading cause of death in the United States.[7] The virus has continued to spread at high rates across the South, Midwest, and West, with Florida becoming a worldwide epicenter for the virus.[8] Florida is one of only five states with COVID-19 fatalities surpassing 10,000, half of which occurred in the last month alone.[9] And though Florida's statewide numbers have decreased recently, the decline in COVID-19 testing has declined as well, skewing the overall case numbers in the United States.[10] Furthermore, Florida's current numbers are still substantially higher than those seen at the

---

[7] Jan Wesner Childs, The Weather Channel, *Coronavirus Updates: COVID-19 is Third Leading Cause of Death in U.S.* (Aug. 18, 2020), available at https://weather.com/health/coronavirus/news/2020-08-18-coronavirus-update-leading-cause-of-death-us-covid19.

[8] CDC COVID Data Tracker, available at https://www.cdc.gov/covid-data-tracker/#cases (last visited Aug. 25, 2020).

[9] Nathaniel Weixel, The Hill, *Florida Surpasses 10,000 coronavirus deaths* (Aug. 19, 2020), available at https://thehill.com/policy/healthcare/512734-florida-surpasses-10000-coronavirus-deaths.

[10] Will Feuer, Nate Rattner, CNBC, *Accuracy of U.S. Coronavirus data thrown into question as decline in testing skews drop in new cases* (Aug. 12, 2020), available at https://www.cnbc.com/2020/08/12 /accuracy-of-us-coronavirus-data-thrown-into-question-as-decline-in-testing-skews-drop-in-new-cases.html.

beginning of the COVID-19 outbreak in March 2020, when Chief Judge Merryday of the United States District Court for the Middle District of Florida entered an order concerning a court's authority to conduct criminal proceedings by video or audio conference. *See Administrative Order*, Case No.: 8:20-mc-25 (M.D. Fla. Mar. 29, 2020).

The pandemic is also likely to "get worse before it gets better." Dr. Robert Redfield, director of the US Centers for Disease Control and Prevention (CDC), has warned Americans about the "worst fall, from a public health perspective, we've ever had."[11] An ensemble forecast published by the CDC predicts the death toll will rise to 189,000 by September 5, 2020, and vaccines will not be ready until at least the beginning of 2021.[12] Such projections are grim and forbidding.

Despite the horrifying worldwide effects of the COVID-19 pandemic, however, the district court below has refused to continue Mr. Lasane's trial for an additional 60 days, instead, prioritizing the

---

[11] Jan Wesner Childs, The Weather Channel, *Coronavirus Updates: COVID-19 is Third Leading Cause of Death in U.S.* (Aug. 18, 2020), available at https://weather.com/health/coronavirus/news/2020-08-18-coronavirus-update-leading-cause-of-death-us-covid19.

[12] *Id.*

completion of federal criminal proceedings over Mr. Lasane's constitutional rights, including his right to effective assistance of counsel. *See Baker*, 432 F.3d at 1248 (The Sixth Amendment right to counsel guarantees a defendant "both a fair opportunity to be represented by counsel of his choice and a sufficient time within which to prepare a defense.") (citing *Gandy v. Alabama*, 569 F.2d 1318, 1321 (5th Cir. 1978). Mr. Lasane's motion to continue explained how the COVID-19 pandemic has infringed on his Sixth Amendment right to effective counsel, both in regards to limited, shortened phone calls and in-person meetings at the jail, replete with the intrusion of other visitors and prison employees. Doc. at 61. Both constitutional standards and professional standards[13] require attorneys to have reasonable communication with their clients, something that has been greatly hindered by the pandemic.

In addition to protecting Mr. Lasane's constitutional rights, a continuance of trial is compelled by the devastating health risks COVID-19 poses to Mr. Lasane, his attorney, courtroom personnel, the venire,

---

[13]   The American Bar Association has outlined reasonable communication between a lawyer and client being necessary for the client to effectively participation in the representation. Model Rules of Prof'l Conduct R. 1.4.

and the public.  Mr. Lasane is being held at SJC, a facility that has been ravaged by COVID-19 with at least 43 inmates testing positive in the last week alone.[14]  Moreover, as illustrated by Dr. Lofgreen's declaration, *see* Doc. 61-1, and the CDC's website, anyone in the courtroom could contract the COVID-19 virus and pass it to others, including those at the homes of the courtroom participants.[15]  This concern is particularly dire for defense counsel, who lives with two individuals who are at high-risk of death or serious illness from COVID-19.

Ultimately, the district court failed to address any of Mr. Lasane's concerns in its endorsed order denying Mr. Lasane's motion to continue.  Doc. 63.  The district court thus erred in summarily rejecting Mr. Lasane's compelling reasons to continue the trial.

---

[14] Katie Rice, Orlando Sentinel, *45 inmates test positive for COVID-19 at Seminole County Jail* (Aug. 19, 2020), available at https://www. orlandosentinel.com/news/breaking-news/os-ne-coronavirus -42-positive- seminole-county-jail-new-procedures-20200820-6c6io7ufvzflrdlg4ptnljsn t4-story.html.

[15] CDC, *Social Distancing* (updated July 15, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social- distancing.html (noting that though the risk of severe illness may be different for everyone and that anyone can get and spread COVID-19, as the virus can live for hours or even days on a surface).

### c. A writ is appropriate under the circumstances.

It is difficult to imagine circumstances calling for action more pressing than the ones that Mr. Lasane finds himself in now. He is a criminal defendant in a court that has prioritized the completion of federal proceedings over the serious health concerns arising from a once-in-a-century pandemic that does not currently have a vaccine or a cure.

In the absence of a vaccine or cure, the pandemic "presents a clear and present danger to free society for reasons that need no elaboration." *United States v. Ramos*, No. 16-CR-826 (PAE), 2020 WL 3642050 at *2 (S.D.N.Y. July 6, 2020). And what is more chilling is how little we know about this highly infectious danger. *See United States v. Kelly*, No. 3:13-CR-59-CWR-LRA-2, 2020 WL 2104241 at *7 n.14 (S.D. Miss. May 1, 2020) ("[W]e simply don't know all that we don't know about this disease."); Columbia University, *What We Know and Still Don't Know About COVID-19* ("Scientists are still learning about the many ways the virus that causes COVID-19 affects the body, both during initial infection and as symptoms persist.").[16]

---

[16] Columbia University, *What We Know and Still Don't Know About COVID-19* (July 22, 2020), available at https://news.columbia.edu/news/what-we-know-and-still-dont-know-about-covid-19.

The science is clear and undisputed, however, that COVID-19 spreads easily between people in close proximity, and it can spread between people who are never physically in the same room because it stays in the air for up to "14 minutes." *People First of Ala. v. Sec'y of State for Ala.,* No. 20-12184, 2020 WL 3478093, at *7 (11th Cir. June 25, 2020). It is also undisputed that the deadly virus "finds its way into almost every workplace and communal setting." *Faour Abdallah Fraihat v. United States Immigration & Customs Enf't*, No. EDCV 19-1546 JGB (SHKx), 2020 WL 1932570 at *23 (C.D. Cal. Apr. 20, 2020). Courthouses are no exception. And jails are among the very highest risk settings that exist. *See, e.g., United States v. Chopra*, No. 18-CR-20668-MIDDLEBROOKS, 2020 WL 4333507, at *3 (S.D. Fla. July 24, 2020) ("Courts around the country have recognized that the risk of COVID-19 to people held in jails and prisons 'is significantly higher than in the community, both in terms of risk of transmission, exposure, and harm to individuals who become infected.'"); *United States v. Breslin*, No. 16-cr-00515-YGR-1, 2020 WL 4584244, at *2 (N.D. Cal. Aug. 10, 2020) ("[T]he Court is mindful of the . . . particular health risks [COVID-19] presents, especially within the jail and prison setting and despite efforts by certain

facilities to control the spread of the virus."); *Ochoa v. Kolitwenzew*, No. 20-cv-2135, 2020 WL 2850706, at *11 (C.D. Ill. June 1, 2020)( "The situations at … jails and detention centers across the country have shown just how rapidly this virus can spread in a jail-like setting. For individuals like Petitioner, with a heightened risk of serious illness or death from COVID-19, the conditions are objectively serious.").

The district court below has clearly taken precautions to protect those involved in the trial. Doc. 64 at 14–15 (noting that everyone in the courtroom will be masked and required to socially distance; jurors and witnesses will be outfitted with a clear face shields; and plexiglass separation barriers will be placed throughout the courtroom). However, much of what the district court has proposed is "safety theater"—actions that do not actually have any basis in science. As Mr. Lasane argued before the district court, "[t]he efficacy of masks, facial coverings, clear face shields, and clear plexiglass screens is unknown given the novelty of the virus." Doc. 61 at 6; *see* Doc. 61-1 at 6–8.

The heavy reliance on plexiglass barriers, for instance, may be a reasonable, common-sense approach for quick person-to-person transactions in a convenience store or for grabbing takeout at a local

restaurant.[17]  In a situation where more than a dozen people are in the courtroom for prolonged periods of time, however, the barriers simply cannot offer adequate protection.  *See* Doc. 61-1 ("Other physical barriers, such as the use of plastic shields or boxes around individuals, are of unknown effectiveness, especially in their ability to protect an individual from small, suspended particles (rather than relatively larger droplets). Such particles are readily generated by sneezing, coughing or talking.").

Furthermore, the district court never addressed the flow of particles naturally caused by ventilation systems.[18]  As research demonstrates, the flow of particles can cause the COVID-19 virus to float in the air, making any indoor space, be it an elevator or courtroom, a hot spot for infection risk.[19]  The risks are compounded by differences in

---

[17] Mayde Gomez, ABC 10 (Mar. 30, 2020), https://slate.com/news-and-politics/2020/03/courts-coronavirus-spread.html ("[E]ven if a shield does help protect, you still can't let your guard down." "It's something.  It's a barrier between a person who could potentially have COVID-19 or any germs" but while these "sneeze shields things offer some peace of mind, they are not the only thing that needs to be done.").

[18] Jeremy Olson, Star Tribune, *U works to pinpoint how indoor spaces, ventilation affect COVID-19 hot spots* (July 6, 2020) https://www.startribune.com/from-elevators-to-concert-halls-university-of-minnesota-studies-indoor-covid-19-hot-spots/571631162/.

[19] *Id.*

17

ventilation systems that can spread particles capable of carrying viruses.[20]   The phenomenon of virus transmission in a complicated courthouse environment is simply too complex to be addressed through amateur guesswork measures.   Yet, in emphasizing the newly-erected plexiglass barriers in the Orlando courtroom, the court below did not cite to any comprehensive study or scientific analysis addressing how the barriers would combat the ventilation in that enclosed space.

The court similarly did not explain the failures of masks and face shields in adequately protecting members of the courtroom.   As Mr. Lasane previously argued before the district court:

> Mask are difficult to use correctly.  They must be sufficiently thick as to block exhaled droplets, must be properly fitted, worn over both the nose and mouth continually.   These difficulties are exacerbated over longer period of time in which masks have to be worn where the potential discomfort and difficult communicating in masks makes it likely that they will be adjusted, taken off temporarily, etc. Even in a setting where mask wearing is both mandatory and enforced, some of these difficulties will doubtlessly arise.

---

[20] *Id.*; *see* McKinsey & Company, *Can HVAC systems help prevent transmission of COVID-19* (July 9, 2020), https://www.mckinsey.com /industries/advanced-electronics/our-insights/can-hvac-systems-help-prevent-transmission-of-covid-19# ("Although much remains unknown about COVID-19, scientists have established that the coronavirus is highly contagious and transmitted via air . . . [q]uestions remain, however, about whether tiny coronavirus particles, of about 0.1 microns in size, can become airborne and travel greater distances").

18

Face shields, similarly, are primarily intended to protect against large droplets striking the shield directly, as from a cough or sneeze, as well as protect the eyes. They may not provide adequate protection from suspended particles in the air, aerosolized particles, etc. One report out of Switzerland[18] suggests they are ineffective as compared to masks, and most studies out of hospital environments involve the use of other PPE at the same time and are difficult to directly interpret.

Doc. 61-1 at 6–7.[21]

Ultimately, the district court's stance—in requiring Mr. Lasane to proceed with the September trial date—is even more disturbing as this unsafe situation will affect not only the participants in the courtroom in September, but the many other people they come across.  Mr. Lasane simply seeks a reasonable remedy under unprecedented circumstances: he requests this Court to issue a writ requiring the district court to continue Mr. Lasane's federal trial proceedings for 60 days, so that there may be more time to understand the nature of COVID-19 before a number of people, including members of the public, are put at high risk.

---

[21] Cleveland Clinic, *Will a Face Shield Protect You From the Coronavirus* (July 28, 2020), https://health.clevelandclinic.org/will-a-face-shield-protect-you-from-the-coronavirus/ (noting that while a face shield reduced the exposure of an influenza-infused aerosol 96 percent from a distance of 18 inches away, the CDC does not recommend wearing face shield for normal everyday activities or as a substitute for cloth face coverings).

Due to the drastic and irreparable nature of COVID-related concerns—including serious illness or death—no other adequate remedy exists except a writ of mandamus.

## CONCLUSION

Mr. Lasane respectfully requests this Court issue a writ of mandamus ordering the district court to continue Mr. Lasane's federal criminal trial for 60 days until the November trial term.

Respectfully submitted,

JAMES T. SKUTHAN
ACTING FEDERAL DEFENDER

/s/ Joshua R. Lukman
JOSHUA R. LUKMAN
ASSISTANT FEDERAL DEFENDER
FL Bar Number: 0088213
201 S. Orange Ave., Ste. 300
Telephone: 407-648-6338
joshua_lukman@fd.org
Counsel for Petitioner

/s/ Ali Kamalzadeh
ALI KAMALZADEH
ASSISTANT FEDERAL DEFENDER
FL Bar Number 115995
201 S. Orange Ave., Ste. 300
Telephone: 407-648-6338
ali_kamalzadeh@fd.org
Counsel for Petitioner

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

In accordance with Fed. R. App. P. 32(g)(1), I hereby certify that this Petition complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because this Petition contains 4,033 words according to Microsoft Word's word count, excluding the parts of the motion exempted by Fed. R. App. P. 32(f).

/s/ Joshua R. Lukman
**JOSHUA R. LUKMAN**
**ASSISTANT FEDERAL DEFENDER**

/s/ Ali Kamalzadeh
**ALI KAMALZADEH**
**ASSISTANT FEDERAL DEFENDER**


## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of August 2020, a true copy of the foregoing *Petition for a Writ of Mandamus* was filed using the Court's Electronic Case Filing system, and will send a copy via email to Karen Gable, Assistant United States Attorney.

/s/ Joshua R. Lukman
**JOSHUA R. LUKMAN**
**ASSISTANT FEDERAL DEFENDER**

/s/ Ali Kamalzadeh
**ALI KAMALZADEH**
**ASSISTANT FEDERAL DEFENDER**

# APPENDIX

# Doc. 1

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### Middle District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Vince Edward Lasane | ) | Case No. |
| | ) | 6:19-mj-1791 |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of   Sept. 29, 2019 to October 26, 2019   in the county of _____ Volusia _____ in the

___ Middle ___    District of _____ Florida _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2422(b) | Attempted online enticement of a minor. |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Task Force Agent Aja Stake
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  *11-1-2019*

_____
*Judge's signature*

City and state: _____ Orlando, FL _____

THOMAS B. SMITH, U.S. Magistrate Judge
*Printed name and title*

**STATE OF FLORIDA**                    **CASE NO. 6:19-mj-** 1791

**COUNTY OF ORANGE**

## AFFIDAVIT

## INTRODUCTION

I, Aja Stake, being duly sworn, do hereby depose and state as follows:

1.      I am a Task Force Agent (TFA) with the United States Department of Homeland Security Investigations, formerly the United States Customs Service. I am currently assigned to the Office of the Resident Agent in Charge, Cocoa Beach, Florida, which is responsible for conducting criminal investigations and enforcing laws that are under the investigative jurisdiction of United States Immigration and Customs Enforcement in the counties of Brevard and Volusia, in the Middle District of Florida. I am a cross-designated law enforcement officer of the United States within the meaning of Section 1401(I) of Title 19, United States Code, and am empowered to investigate and make arrests for violations of U.S. criminal laws within the meaning of Section 2510(7) of Title 18, United States Code.

2.      In September 2018, I was assigned as a TFA with the United States Immigration and Customs Enforcement, Homeland Security Investigations (ICE/HSI). I am currently employed by the Brevard County Sheriff's Office (BCSO) and assigned to the Sexual Offender Registration and Tracking Unit to

investigate Internet crimes against children. I have been a sworn law enforcement officer in the State of Florida since 2001.

3.    As a TFA, my responsibilities include investigating possible criminal violations of U.S. Customs and related laws. I have received extensive training and practical experience in the investigations of sex crimes, child exploitation, child pornography, and computer crimes. I have been involved in investigations involving child pornography and online enticement of a minor. I have participated in investigations of persons suspected of violating federal child pornography laws, including 18 U.S.C. §§ 2251(a), 2252 and 2252A. I have also participated in investigations of persons suspected of violating federal laws pertaining to the enticement of minors in violation of 18 U.S.C. § 2422(b). I have participated in various training courses for the investigation and enforcement of federal child pornography laws in which computers are used as the means for receiving, transmitting, and storing child pornography. Additionally, I have been involved in authoring and participated in the execution of search warrants involving searches and seizures of computers, computer equipment, software and electronically stored information.

4.    I submit this affidavit in support of a criminal complaint for **VINCE EDWARD LASANE**. As set forth in more detail below, I have probable cause to believe that beginning on or about September 29, 2019 and

2

continuing through on or about October 26, 2019, **LASANE** knowingly attempted to persuade, induce, entice or coerce an individual who had not attained the age of 18 years to engage in any sexual activity for which any person could be charged with a criminal offense using his ZTE Z855 cellphone, in violation of 18 U.S.C. § 2422(b).

5.     I make this affidavit from personal knowledge based on my participation in this investigation, information from other criminal investigators, information from law enforcement officers, information from agency reports, and review of recordings and documents provided to me. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint, I have not set forth each and every fact learned during the course of this investigation.

## INVESTIGATION

6.     On September 29, 2019, I was acting in an undercover capacity as a 14-year-old-girl ("UC") and posted a profile on a dating-focused social networking website. While on this website, a person whom I later identified as **VINCE EDWARD LASANE** sent the UC a message, "Hello," and asked "[W]hat are you looking for on here." The UC responded, "idk meetin ppl." **LASANE** responded, "How old are you" and the UC stated, "Im 14 sux sooo bad." **LASANE** responded, "Wow," and "That does suck." **LASANE** then

3

asked the UC "So you like older guys" and "Are you freaky." When the UC asked **LASANE** what he meant, he responded by saying, "Sex," and asked her if she wanted to be friends. **LASANE** also asked the UC for more pictures. The UC sent a picture depicting a girl who was approximately 14-years-old at the time the picture was taken, and **LASANE** asked her, "Have you ever had sex before." The UC told him she had never had sex before, and **LASANE** responded, "Would you like to." **LASANE** asked the UC if she could get to Orlando, and the UC replied, "im 14 cant drive." **LASANE** then told her to take the train. He also asked the UC for a nude picture and when she refused, **LASANE** asked her, "Can I be the first one you have sex with," and "when do you want to do it." **LASANE** also asked the UC, "Do you want to try anal sex to," and when the UC asked him if it was going to hurt, he stated, "Yes" and asked her if she still wanted to do it. **LASANE** also told the UC he has a "big penis" and asked her if she wanted to see it. **LASANE** and the UC then began communicating via text message.

7.      On September 29, 2019 at about 10:35 pm, the UC received a text message from **LASANE** using telephone number (321) 283-9656. During the text communications, **LASANE** continued to entice the UC to engage in sexual activity and asked her, "Do you play with yourself."

4

8.     On September 30, 2019, at approximately 6:53 am, **LASANE** sent the UC a text message, "Hey." **LASANE** asked the UC, "did you think about me last night," and "Send me a beautiful picture of you [sic] full body pic." **LASANE** asked the UC, "Can I be your boyfriend" and "Will you be my girlfriend." Later in the day, **LASANE** asked the UC if she would video chat with him, and the conversations between **LASANE** and the UC then transitioned to Kik, a separate social networking site.

9.     **LASANE** used the profile name "Vee L" on Kik. I looked at the profile picture associated with the "Vee L" account, and the person depicted in the profile picture is **LASANE**. I was also able to screen capture **LASANE's** face as he attempted to video chat with the UC.

10.     On September 30, 2019, at approximately 10:22 pm, **LASANE** called the UC. During the recorded call, **LASANE** discussed with the UC that she was "underage." **LASANE** asked the UC about a bus that she could take from her home to Orlando, so they could meet on Saturday, October 5, 2019. **LASANE** asked the UC if she "likes to kiss" and asked her, "Do you have hair down there or do you shave?" **LASANE** referenced his previous conversation with the UC, and asked her, "Are you still curious?" and "Is that something you really want to do?" When the UC asked **LASANE** if it was something he wanted to do, **LASANE** said yes. **LASANE** also told the UC, "Because it's

5

your first time, I'm going to have to get some lube." **LASANE** also asked the UC if she had ever watched porn before.

11.    On September 30, 2019, following the telephone conversation, **LASANE** sent text messages to the UC and told her that he loved her voice. He also stated, "I hope that your not trying to set me up," and when the UC responded, "set u up????," **LASANE** explained, "Your age." **LASANE** later asked the UC, "Are you going to make me fall in love with you."

12.    On October 2, 2019, LASANE texted the UC and asked her if she could talk and when the UC said yes, **LASANE** texted, "Ok call me." The UC called **LASANE** and during the recorded conversation, **LASANE** told the UC that he was trying to figure out their weekend plans and told her, "I am dying to meet you. Just to hang out and have some fun." **LASANE** discussed with the UC her means of transportation to Orlando to meet him. During the conversation, **LASANE** asked the UC to send him a full body picture of herself, and a picture of herself in her, "bra and panties."

13.    On October 4, 2019, at about 11:45 pm, **LASANE** called the UC and the UC missed the phone call and called **LASANE** back. During the recorded call, **LASANE** told the UC, "You know I'm stuck between a rock and a hard place right. I want to meet you. I want to see you, but we've got complications." **LASANE** explained, "I'm 47. It's not like I don't want to see

6

you or meet you ok. But you know, I've got to be careful and cautious about the way I do things, because you know you get on like Internet Crimes and stuff like this right here. And then you going to meet a person that you think is who you're talking to and then when you get ready to meet them then you actually you know what I'm saying go and meet the police."

14.    During the call on October 4, 2019, **LASANE** told the UC that he wanted to video chat with her, so he could actually see her. **LASANE** stated, "I'm not trying to go to prison." **LASANE** told the UC they would meet, but he was going to be cautious about how they met. **LASANE** told the UC that he wanted to date her and have her all to himself. When the UC said that she was only 14 years old, **LASANE** replied that if anyone asked the UC her age, she needed to say that she was 18 years old. **LASANE** told the UC she could not let anyone know about them or they would get into trouble. **LASANE** explained that he would get into trouble and that he could go to prison, because she was a minor.

15.    During the call, **LASANE** told the UC that he had to work on Saturday, so they would have to meet the next Saturday, which was October 12, 2019. **LASANE** told the UC that what they talked about was not going to happen on the first date, unless she wanted it to happen. **LASANE** explained, "I'm not small downstairs and you have never done it right." **LASANE** told the

7

UC it was going to hurt. **LASANE** stated that he would teach the UC some

things, and that she did not get to try these things on anyone else. **LASANE**

asked the UC if she had ever "sucked on a penis". **LASANE** told the UC that

she needed to know how to please her man and he stated, "And trust me I plan

on pleasing you." **LASANE** also told the UC that she needed to give his penis

a name. **LASANE** stated, when they meet next Saturday, if she is still curious,

"we can try it." **LASANE** explained to the UC, "[b]eing it's your first time I'm

going to have to get a dark towel to put up under you". **LASANE** also told the

UC that he wanted someone who was willing to experiment and asked the UC

if she would let him do "anal." **LASANE** told the UC it would hurt, but he

would go slow.

16.    On October 11, 2019, at approximately 10:00 pm, **LASANE**

called the UC. During the recorded call, **LASANE** arranged to meet the UC on

Saturday, October 12, 2019, at 12:00 pm, at a restaurant in downtown Orlando.

**LASANE** told the UC he hoped he would not get any surprises because of her

age and that he did not want the police there to arrest him. **LASANE** said he

had to be careful because he had kids and he could not go to prison. **LASANE**

asked the UC when she would turn 15 years old, and said that when she turned

18 years old, he wanted to marry her. **LASANE** also told the UC that he would

8

buy her a cellular telephone and make the payments every month, so he could video chat with her.

17. On the morning of October 12, 2019, **LASANE** texted the UC and told her that he could not meet with her because he had to work, but that they could meet the next Saturday, October 19, 2019.

18. On October 17, 2019, **LASANE** texted the UC and discussed their upcoming meeting. **LASANE** asked the UC, "Do you play with yourself." **LASANE** also told the UC to wear a mini skirt when they met on Saturday.

19. On October 18, 2019, at approximately 11:55 pm, **LASANE** called the UC. During that recorded call, **LASANE** told the UC that he wanted her to wear a skirt when they met. **LASANE** stated, "Understand one thing, your man is not small downstairs. So if that take place tomorrow or whenever, I'm not small downstairs." **LASANE** told the UC they could hang out and he stated, "If it lead up to it tomorrow it's up to you."

20. On October 19, 2019, **LASANE** texted the UC and cancelled the meeting because of a storm that was occurring that day. **LASANE** told the UC they would meet the next weekend, which was October 26, 2019.

21. During a text message on October 24, 2019, the UC told **LASANE** that she was going to Orlando later that day with her friend to take care of her friend's dog and that she would be in Orlando until Sunday. **LASANE** asked

9

the UC if he could meet her at her friend's house on Saturday, which was October 26, 2019.

22.     During several text messages on October 25, 2019, **LASANE** repeatedly asked the UC for her location and address.

23.     At approximately 7:00 pm on October 25, 2019, **LASANE** texted the UC and told her to call him. At approximately 7:26 pm, the UC called **LASANE**. During that recorded call, **LASANE** arranged to meet the UC the next day at 12:00 pm at a restaurant in Orlando. In that conversation, **LASANE** told the UC that when they first meet, he wanted her to grab his penis when no one was looking, so that he knew she was not the police. **LASANE** said that he would grab her breast or vagina when they first met, so that she would know that he was not the police. The UC stated that she did not want to be 14 years old and pregnant, and **LASANE** replied that she would not get pregnant, because he would wear a condom.

24.     On October 26, 2019, **LASANE** called the UC to confirm their meeting. **LASANE** told the UC that he might be a few minutes late, because he was going to stop at the store and get some condoms "just in case." **LASANE** told the UC he would let her know when he was on his way. At approximately 11:46 am, **LASANE** sent a text message to the UC stating that he was getting ready to leave. About one hour later, **LASANE** arrived at the prearranged

10

location on a bicycle. Law enforcement officers arrested **LASANE**, and charged him with violations of Florida law.

25. A law enforcement officer advised **LASANE** of his Miranda Rights, which he waived. **LASANE** agreed to speak with law enforcement officers. **LASANE** admitted that he had been communicating with a 14-year-old-girl about sex, and that he arranged to meet her at the restaurant.

26. Law enforcement officers conducted a search of **LASANE's** person incident to his arrest, and located a blue and black ZTE Z855 cellphone and a gold Trojan Magnum condom in his right front pocket. I called the cellular telephone number that **LASANE** used to communicate with the UC, which was (321) 283-9656. The ZTE cellular telephone that officers seized from **LASANE** rang, and the UC's name displayed on the screen as the contact name making the call.

27. During the investigation, I learned that **LASANE** was a registered Sexual Predator in Florida. Specifically, on June 1, 2007, **LASANE** was convicted in the Ninth Judicial Circuit, Orange County, Florida, of Attempted Sexual Battery of a victim under the age of 12, in violation of F.S. § 794.011(2). The Honorable Marc L. Lubet, Circuit Judge, sentenced **LASANE** to ten years in state prison, followed by a period of ten years on Sexual Offender probation under the supervision of the Department of Corrections. Judge Lubet also

11

ordered **LASANE** to register as a Sexual Predator pursuant to the provisions of F.S. § 775.21.

28. **LASANE** was released from prison on March 18, 2015 and is currently on Sexual Offender probation under the supervision of the Department of Corrections. **LASANE** is also required to be on GPS monitoring as a condition of his probation.

29. During the investigation, officers sent a subpoena to T-Mobile requesting the subscriber information for the telephone number (321) 283-9656. T-Mobile responded that the subscriber was Vince Lasane.

30. I researched **LASANE's** prior state Sexual Predator Registrations, and he provided the telephone number (321) 283-9656 as his mobile phone number on his registrations dated January 29, 2019, April 26, 2019 and July 26, 2019.

31. Pursuant to F.S. § 800.04(4), it is unlawful for an adult male to engage a 14-year-old-child in sexual activity.

## CONCLUSION

32. Based on the above, I believe there is probable cause that beginning on or about September 29, 2019 and continuing through on or about October 26, 2019, in the Middle District of Florida, **LASANE** knowingly attempted to persuade, induce, entice or coerce an individual who had not

12

attained the age of 18 years to engage in any sexual activity for which any person could be charged with a criminal offense using his ZTE Z855 cellphone, in violation of 18 U.S.C. § 2422(b).

Aja Stake, Task Force Agent
Homeland Security Investigations

Subscribed and sworn to before me
this _____ day of November, 2019.

THOMAS B. SMITH
United States Magistrate Judge

13

# Doc. 4

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION


UNITED STATES OF AMERICA

v.                                                    CASE No. 6:19-mj-1791

VINCE EDWARD LASANE

**WRIT OF HABEAS CORPUS AD PROSEQUENDUM**

TO:   ANY UNITED STATES MARSHAL; and

      Warden, of the Orange County Jail

      It appearing from the petition of the United States of America that the

defendant in the above case, Vince Edward Lasane, is confined in Orange

County Jail at 3723 Vision Boulevard, Orlando, Florida, and that this case is

set for an initial appearance as to said defendant on November 19,2019, at

10:00 a.m., and that it is necessary for the said defendant to be before this

Court for the initial appearance and all further proceedings in this case:

      NOW, THEREFORE, this is to command you, any United States

Marshal, that you have the body of the said Vince Edward Lasane now

detained in custody as aforesaid, under safe and secure conduct, before this

Court on November 19, 2019, at the United States District Court, 401 W.

Central Boulevard, Orlando, Florida, by or before 10:00 a.m., for an initial

appearance on criminal charges pending against him in this cause.

And this is to command you, Warden, of the Orange County Jail, to deliver into custody of any United States Marshal, upon production to you of a certified copy of this writ, the body of the said defendant for safe and secure conduct to this District for the purpose aforesaid.

FURTHERMORE, this is to command you, any United States Marshal, that upon completion of all further proceedings in this case that you return Vince Edward Lasane with all convenient speed, under safe and secure conduct to the custody of the Warden, of the Orange County Jail.

DONE and ORDERED at Orlando, Florida, this 8th day of November, 2019.

_____
Embry J. Kidd
United States Magistrate Judge

2

# DOC. 6

FILED

UNITED STATES DISTRICT COURT   2019 NOV 13 PM 4: 44
MIDDLE DISTRICT OF FLORIDA   CLERK. US DISTRICT COURT
ORLANDO DIVISION   MIDDLE DISTRICT OF FLORIDA
ORLANDO, FLORIDA

UNITED STATES OF AMERICA

v.

CASE NO. 6:19-cr- 241-ORL-37DCI

18 U.S.C. § 2422(b)

VINCE EDWARD LASANE

18 U.S.C. § 2260A

## INDICTMENT

The Grand Jury charges:

## COUNT ONE

Beginning on or about September 29, 2019 and continuing to on or about October 26, 2019, in the Middle District of Florida and elsewhere, the defendant,

### VINCE EDWARD LASANE

using a facility and means of interstate commerce, that is a ZTE cell phone and the Internet, did knowingly attempt to persuade, induce, entice and coerce an individual who had not attained the age of 18 years to engage in sexual activity for which any person could be charged with a criminal offense, that is Lewd and Lascivious Battery, in violation of F.S. § 800.04(4).

In violation of 18 U.S.C. § 2422(b).

## COUNT TWO

Between on or about September 29, 2019 and on or about October 26,

2019, in the Middle District of Florida and elsewhere, the defendant,

**VINCE EDWARD LASANE,**

being required to register as a sex offender under the laws of the state of

Florida, committed the felony offense involving a minor charged in Count

One of this Indictment.

In violation of 18 U.S.C. § 2260A.

## FORFEITURE

1. The allegations contained in Count One are incorporated by reference for the purpose of alleging forfeiture, pursuant to the provisions of 18 U.S.C. § 2428.

2. Upon conviction of a violation of 18 U.S.C. § 2422(b), the defendant shall forfeit to the United States, pursuant to 18 U.S.C. § 2428:

   a. any property, real or personal, that was used or intended to be used to commit or to facilitate the commission of such violation; and

   b. any property, real or personal, constituting or derived from any proceeds that such person obtained, directly or indirectly, as a result of such violation.

3. The property to be forfeited includes, but is not limited to, the following: ZTE Cellular Phone, Model Number Z855.

4. If any of the property described above, as a result of any act or

omission of the defendant:

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third person;

    c.    has been placed beyond the jurisdiction of the Court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property which cannot be subdivided without difficulty;

the United States shall be entitled to forfeiture of substitute property pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 2253(b).

A TRUE BILL,

Foreperson

MARIA CHAPA LOPEZ
United States Attorney

By: 

Karen L. Gable
Assistant United States Attorney

By: 

Sara C. Sweeney
Assistant United States Attorney
Deputy Chief, Orlando Division

3

FORM OBD-34
APR 1991

No.

# UNITED STATES DISTRICT COURT
Middle District of Florida
Orlando Division

## THE UNITED STATES OF AMERICA

vs.

## VINCE EDWARD LASANE

# INDICTMENT

Violation:   18 U.S.C. § 2422(b)
18 U.S.C. § 2260A

A true bill,

_____
Foreperson

Filed in open court this 13th day

of November, 2019.

_____
Clerk

Bail $ _____

# DOC. 27

**Lisa Darnell**

| | |
|---|---|
| **From:** | cmecf_flmd_notification@flmd.uscourts.gov |
| **Sent:** | Thursday, February 20, 2020 11:59 AM |
| **To:** | cmecf_flmd_notices@flmd.uscourts.gov |
| **Subject:** | Activity in Case 6:19-cr-00241-RBD-DCI USA v. Lasane Notice of Hearing |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

<div align="center">

**U.S. District Court**

**Middle District of Florida**

</div>

**Notice of Electronic Filing**

The following transaction was entered on 2/20/2020 at 11:58 AM EST and filed on 2/20/2020

| | |
|---|---|
| **Case Name:** | USA v. Lasane |
| **Case Number:** | 6:19-cr-00241-RBD-DCI |
| **Filer:** | |
| **Document Number:** | 27(No document attached) |

**Docket Text:**

**NOTICE OF HEARING as to Vince Edward Lasane: Jury Trial set for 3/2/2020 at 09:00 AM in Orlando Courtroom 4 A before Judge Roy B. Dalton, Jr. (BIA)**

**6:19-cr-00241-RBD-DCI-1 Notice has been electronically mailed to:**

Karen L. Gable     karen.gable@usdoj.gov, caseview.ecf@usdoj.gov, orldocket.mailbox@usdoj.gov, usaflm.orl_ecf@usdoj.gov

Joshua Roy Lukman     joshua_lukman@fd.org, lisa_darnell@fd.org

**6:19-cr-00241-RBD-DCI-1 Notice has been delivered by other means to:**

# DOC. 41

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                    CASE NO. 6:19-cr-241-Orl-37DCI

VINCE EDWARD LASANE

### GOVERNMENT'S EMERGENCY MOTION TO CONTINUE TRIAL

The United States of America respectfully requests that this Court continue the trial in this case due to the significant illness of the case agent, who is also an essential trial witness, leading to her unavailability for trial. Trial is currently set to begin on Monday, March 2, 2020. The United States requests that the Court re-set trial to begin on Monday, March 9, 2020.

Task Force Agent Aja Stake, of Homeland Security Investigations, is the case agent. She additionally served in an undercover capacity during online communications with the defendant. Her testimony is essential to the United States' case.

TFA Stake came down with the flu over the weekend, and she has continued to become more ill as of today. Her doctor advised her today that hospitalization may be necessary tomorrow if her condition does not improve. Because TFA Stake is not improving, the United States is concerned that she will be medically unable to attend trial on Monday. Further, it is presently

unclear when TFA Stake will be well enough to attend trial.

The undersigned is also set for trial on March 23, 2020, in the case of *United States v. Mark Goolsby*, case number 6:19-cr-263-Orl-78GJK, in front of the Honorable Wendy Berger. It is possible but not certain that defense counsel may seek a continuance of that trial.

As to the speedy trial calculation in this case, the defendant made his initial appearance on November 19, 2019, Doc. 10, and he moved for a continuance of trial on December 19, 2019, Doc. 24. At the time of the motion for continuance, approximately 30 days had elapsed from the speedy trial clock. The Court then granted the defense motion for continuance of trial, Doc. 25, excluding the time that has elapsed between December 19, 2019, and the present. *See* 18 U.S.C. § 3161(h)(7). Thus, approximately 40 days remain on the speedy trial clock.

If the Court grants this continuance, the time would be excludable under 18 U.S.C. § 3161(h)(3), which excludes from the speedy trial clock "delay resulting from the … unavailability of … an essential witness." The United States also submits that the ends of justice would be served by granting this continuance and excluding the time from the speedy trial calculation. *See* 18 U.S.C. § 3161(h)(7). Further, although not determinative, the defendant has waived his right to speedy trial until March 31, 2020. Doc. 22.

The United States consulted with counsel for the defendant, Joshua
Lukman, who has not yet taken a position due to his inability to consult with
his client.

For all of these reasons, the United States requests that this Court
continue trial to Monday, March 9, 2020.

> Respectfully submitted,
>
> MARIA CHAPA LOPEZ
> United States Attorney
>
> By:     s/*Karen L. Gable*
> Karen L. Gable
> Assistant United States Attorney
> USA No. 025
> 400 W. Washington Street, Suite 3100
> Orlando, Florida 32801
> Telephone: (407) 648-7500
> Facsimile: (407) 648-7643
> E-mail:    Karen.Gable@usdoj.gov

**U.S. v. Lasane**                    **Case No. 6:19-cr-241-Orl-37DCI**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 27, 2020, I electronically filed the

foregoing with the Clerk of the Court by using the CM/ECF system which

will send a notice of electronic filing to the following:

Joshua Lukman

<u>s/ *Karen L. Gable*</u>
Karen L. Gable
Assistant United States Attorney
USA No. 025
400 W. Washington Street, Suite 3100
Orlando, Florida 32801
Telephone: (407) 648-7500
Facsimile: (407) 648-7643
E-mail:     Karen.Gable@usdoj.gov

4

# DOC. 49

# UNITED STATES OF AMERICA
## V.
## VINCE EDWARD LASANE

## CASE NO: 6:19-CR-241-ORL-37DCI

| 03/18/2020 | 49 | NOTICE canceling Jury Trial hearing scheduled for 03/31/2020 as to Vince Edward Lasane. (BIA) (Entered: 03/18/2020) |
|---|---|---|

# DOC. 50

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

VS.                                            CASE NO: 6:19-cr-241-Orl-37DCI

VINCE EDWARD LASANE

_____

ORDER

This matter is before the Court upon a *sua sponte* review of the file. In light of the COVID-19 health emergency and its far-reaching impacts, the Court is inclined to continue as many proceedings as possible. Accordingly, the Court adopts the omnibus order entered on March 26, 2020 (See 6:20-mc-17-ORL-37, Doc. 2). The Court finds that the interests of justice outweigh the best interests of the public and the Defendant in a speedy trial. All time between March 26, 2020 and July 31, 2020 is excluded from the speedy trial computation.

It is **ORDERED AND ADJUDGED** that this case is continued until the July, 2020 trial term and the deadline for filing motions is extended until June 12, 2020. The status conference will be held on June 18, 2020 at 8:45 am. The Court will issue a separate notice with details of the hearing.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on April 2, 2020.



ROY B. DALTON JR.
United States District Judge


Copies furnished to:


United States Marshal

United States Attorney

United States Probation Office

United States Pretrial Services Office

Counsel for Defendant

# DOC. 54

| From: | cmecf_flmd_notification@flmd.uscourts.gov |
|---|---|
| To: | cmecf_flmd_notices@flmd.uscourts.gov |
| Subject: | Activity in Case 6:19-cr-00241-RBD-DCI USA v. Lasane Notice of Hearing |
| Date: | Thursday, June 11, 2020 11:52:37 AM |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### U.S. District Court

### Middle District of Florida

### Notice of Electronic Filing

The following transaction was entered on 6/11/2020 at 11:52 AM EDT and filed on 6/11/2020

| **Case Name:** | USA v. Lasane |
|---|---|
| **Case Number:** | 6:19-cr-00241-RBD-DCI |
| **Filer:** | |
| **Document Number:** | 54(No document attached) |

**Docket Text:**
**NOTICE OF HEARING as to Vince Edward Lasane: Jury Trial set for the week of 8/10/2020 at 09:00 AM in Orlando Courtroom 4 A before Judge Roy B. Dalton, Jr. Notice of date certain to be filed at a later date. (BIA) (ctp)**

**6:19-cr-00241-RBD-DCI-1 Notice has been electronically mailed to:**

Karen L. Gable    karen.gable@usdoj.gov, caseview.ecf@usdoj.gov, orldocket.mailbox@usdoj.gov, usaflm.orl_ecf@usdoj.gov

Karla Mariel Reyes    karla_reyes@fd.org, karla.m.reyes@gmail.com, lisa.darnell@fd.org

Joshua Roy Lukman    joshua_lukman@fd.org, lisa_darnell@fd.org

**6:19-cr-00241-RBD-DCI-1 Notice has been delivered by other means to:**

# Doc. 61

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

**v.**                                                                    **Case No. 6:19-cr-241-Orl-37DCI**

**VINCE EDWARD LASANE,**

    **Defendant.**

_____ /

## <u>MOTION TO CONTINUE TRIAL</u>

Defendant, Vince Edward Lasane, through undersigned counsel, respectfully moves this Court to continue his trial for 60 days. In support of this motion, Mr. Lasane states the following:

### STATEMENT OF FACTS

***Procedural History Relevant to this Motion***

1.    On February 20, 2020 this Court originally set the jury trial in this case to begin on March 2, 2020. Doc. 27.

2.    On February 27, 2020 the Government filed its Emergency Motion to Continue Trial due to the significant illness of the Government's essential witness. Doc. 41.

3.    On February 28, 2020 this Court conducted a hearing on the Government's Emergency Motion to Continue Trial and, without opposition from Mr. Lasane, this Court granted the Government's motion and rescheduled the trial to begin on March 31, 2020. Doc. 45.

4.      On March 18, 2020 this Court issued an Order Concerning Jury Trials and Other Proceedings tolling speedy and continuing jury trials to "protect public health, reduce the size of public gatherings, and prevent unnecessary travel." *In Re: Coronavirus Public Emergency*, 6:20-mc-17-RBD, Doc. 1.

5.      Also on March 18, 2020 this Court conducted a telephonic conference in this case in light of the COVID-19 health emergency and filed a notice canceling the March 31, 2020 jury trial. Doc 49.

6.      On April 2, 2020 upon a *sua sponte* review of the case file, this Court adopted the omnibus Order entered on March 26, 2020 (6:20-mc-17-ORL-37, Doc. 2) and entered an Order continuing the trial in this case until the July, 2020 trial term. Doc. 50.

7.      On June 11, 2020 this Court conducted a status conference in this case and rescheduled the jury trial to begin on August 10, 2020. Doc. 54.

8.      On July 1, 2020, this Court filed an Amended Order Concerning Jury Trials and Other Proceedings extending the prior moratorium on jury trials. *In Re: Coronavirus Public Emergency*, 6:20-mc-17-RBD, Doc. 4.

9.      On July 6, 2020 upon a *sua sponte* review of the case file, this Court adopted the omnibus Order entered on July 1, 2020 (6:20-mc-17-ORL-37, Doc. 4) and in light of the escalation of COVID-19 infections in the area comprising the Orlando Division of the Middle District of Florida this Court entered an Order continuing the jury trial to the September, 2020 trial term. Doc. 59.

10.      On July 6, 2020 this Court entered a Notice rescheduling the trial to begin on September 7, 2020 and scheduling a status conference for August 20, 2020. Doc. 60.

***Grounds for Continuance***

11.     As of the filing of the instant motion, due to the COVID-19 pandemic, Mr. Lasane and defense counsel have health and safety concerns with proceeding to a jury trial in September or October, 2020.  According to Dr. Eric Lofgren, an epidemiologist currently engaged in COVID-19 research funded by the Centers for Disease Control (CDC),

> The CDC classifies "Medium-sized in-person gatherings that are adapted to allow individuals to remain spaced 6 feet apart and with attendees coming from outside the local area" as "Higher Risk." While trial participants may or may not have come from outside the local area (though arguably Mr. Lasane's transfer from Seminole County Jail constitutes such a circumstance), given the severity of the epidemic within the local area, there remains a substantial risk of transmission.

*See* Declaration of Eric T. Lofgren, MSPH PhD, attached as Exhibit A.

12.     Mr. Lasane is currently detained at the Seminole County Jail (SCJ). Undersigned counsel's access to Mr. Lasane for legal consultation is severely hindered by the SCJ's COVID-19 health and safety protocol regarding visitations with inmates. For example, attorney-client consultation with Mr. Lasane is limited to either: (1) scheduled telephone calls with 30-minute time limits wherein Mr. Lasane is seated in an administrative office at the SCJ and surrounded by corrections officers, or (2) brief in-person visits in the SCJ "bond room" that is shared by and open to both other visitors and an office space occupied by corrections officer(s).[1]  As a result, undersigned counsel is not presently able to engage in effective,

---

[1] Legal calls between attorneys and clients housed at the SCJ must be scheduled in advance and are subject to the availability of the telephone call-in line. To the best of undersigned counsel's knowledge, there is only one secure telephone line available for legal consultation and the inmate receives the legal call while positioned in the SCJ classifications office, which is commonly occupied by a number of corrections officers. As a result, any verbal communication from the inmate is subject to being overheard by a number of corrections officers. Additionally, the "bond room" is an area of the SCJ with two adjacent cells with glass windows equipped with small openings at the bottom of the windows to accommodate the transfer of documents, such as securing inmate signatures on bail/bond paperwork. The visitor-side of these cells is an open room that is shared by

privileged and confidential attorney-client consultations with Mr. Lasane in preparation for trial.[2]

13.     Undersigned counsel is a member of the Florida Bar and bound by the ethical Rules of Professional Conduct as set forth in the Rules Regulating the Florida Bar ("Rules"). A lawyer must not reveal information relating to representation of a client unless required by the Rules or upon the client's informed consent. Rule 4-1.6(a). "A fundamental principle in the client-lawyer relationship is that … the lawyer must not reveal information relating to the representation." Rule 4-1.6, Comment. "The principle of confidentiality is given effect in 2 related bodies of law, the attorney-client privilege … and the rule of confidentiality established in professional ethics." *Id*. "The purpose of the attorney-client privilege is to promote freedom of consultation between client and lawyer by eliminating the fear of subsequent compelled legal disclosure of confidential communications." *United States v. Suarez*, 820 F.2d 1158, 1160 (11th Cir. 1987).

---

any other jail visitors who may be present and within short audible distance of an office that is occupied by the corrections officer(s) who manage visitor access to the area. Due to the small size of the opening in the glass windows between the visitors and the inmates, and general background noise within the jail, undersigned counsel has personally experienced the need to raise his voice to a high volume in order to be heard by his client when speaking, and vice-versa. As a result, the "bond room" does not provide for any degree of confidential attorney-client communication.

[2] Even if Mr. Lasane were housed at the Orange County Jail (OCJ), undersigned counsel has experienced similar issues regarding confidentiality when consulting with clients during COVID-19 related health and safety jail protocol. For example, attorney-client communications at the OCJ are limited to either pre-scheduled and time-restricted telephone calls, or electronic consultation from the OCJ's video visitation center. At the OCJ video visitation center, attorneys use one of multiple computer stations that are all positioned within a single, large room and are subject to being overheard by both other visitors and corrections officers, and inmates on the other end of the video system use one of multiple computer stations located in a common area open to both other inmates and corrections officers.

14.    In addition to the confidentiality concerns expressed herein, undersigned counsel has encountered practical difficulties in relation to consulting with Mr. Lasane on the digital media discovery materials at issue in this case.

15.    Within the week prior to the filing of the instant motion, Mr. Lasane has experienced symptoms of coughing and hoarseness (of voice), which he has not experienced while incarcerated until recently.[3] In addition to the medical concerns and implications associated with these symptoms, undersigned counsel is concerned with how Mr. Lasane would be perceived by a jury if these symptoms persist at trial. That is, anyone in the vicinity of Mr. Lasane may be distracted and concerned about whether he is contagious during this time of heightened awareness and sensitivity to contagious disease.

16.    Undersigned counsel resides with two individuals with underlying health conditions that increase a person's risk of severe COVID-19 illness.

### Certificate of Good Faith

17.    The continuance requested herein is made in good faith and not for the purpose of unnecessary delay. Mr. Lasane, upon consultation with undersigned counsel regarding the shared concerns with proceeding to trial on September 7, 2020, agrees to waive speedy trial through the end of November, 2020.[4]

18.    Pursuant to Local Rule 3.01(g) and this Court's Criminal Scheduling Order, undersigned counsel has conferred with the Assistant United States Attorney in this case, Karen Gable, and the Government opposes the continuance requested herein.

---

[3] Mr. Lasane has provided undersigned counsel with consent to disclose his medical symptoms and conditions in support of the instant motion.
[4] A written waiver of speedy trial will be submitted to the Court by separate filing.

## MEMORANDUM OF LAW

Under 18 U.S.C. §3161(h)(7)(A), the ends of justice would be best served by this Court granting the requested continuance.  According to Dr. Lofgren, delaying in-person trials is a "reasonable and responsible action." Exh. A. The efficacy of masks, facial coverings, clear face shields, and clear plexiglass screens is unknown given the novelty of the virus. *Id.* As explained by Dr. Lofgren, the six-feet distance recommendation is not intended for "long, sustained contact" as needed for a federal criminal jury trial. *Id.* Six feet offers no guarantees of personal safety from the virus, and conversations at shorter distances (required to consult privately with Mr. Lasane during the course of a trial) pose even greater dangers. Dr. Lofgren's opinions are based on science and upon his review of the data concerning the spread of COVID-19 in the Middle District of Florida and Mr. Lasane's medical records.

In determining whether to grant a continuance pursuant to 18 U.S.C. §3161(h)(7)(B)(iv), the Court must consider whether the failure to allow a continuance would deny the attorney for the defendant a reasonable time for effective preparation in exercising due diligence. "The Act requires that when a district court grants an ends-of-justice continuance, it must 'se[t] forth, in the record of the case, either orally or in writing, its reasons' for finding that the ends of justice are served and they outweigh other interests." *Zedner v. United States*, 547 U.S. 489, 506 (2006).  Mr. Lasane asserts that the ends of justice will be best served by granting a continuance to allow for Mr. Lasane and undersigned counsel to monitor the local circumstances surrounding COVID-19, Mr. Lasane's health and symptoms, and the facilitation of confidential attorney-client communication in order to ensure undersigned counsel's ability to provide effective assistance of counsel.

WHEREFORE, given the dangerous and highly infectious nature of COVID-19 and the high risk atmosphere of an enclosed courtroom, Mr. Lasane's specific heightened risk for infection, Mr. Lasane's recent medical symptoms, and the difficulties with facilitating effective and confidential attorney-client communication in preparation for trial, Mr. Lasane respectfully requests that this Honorable Court enter an order continuing his jury trial for 60 days to protect the health and safety of the public and all parties involved in a trial, and provide him with the opportunity for appropriate attorney-client consultation.

I HEREBY CERTIFY that undersigned electronically filed the foregoing *Motion to Continue Trial* with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to Karen Gable, Assistant United States Attorney, this 19th day of August, 2020.

<div style="margin-left:50%">

Respectfully submitted,

JAMES T. SKUTHAN
ACTING FEDERAL DEFENDER

 /s/Joshua R. Lukman
Joshua R. Lukman
Assistant Federal Defender
Florida Bar Number 0088213
201 South Orange Avenue, Suite 300
Orlando, Florida 32801
Telephone: 407-648-6338
Fax: 407-648-6765
E-Mail: joshua_lukman@fd.org

</div>

**EXHIBIT A**

**Declaration of Eric T. Lofgren, MSPH PhD**

## I. Background and Qualifications

1. My name is Eric T. Lofgren and I am employed as an Assistant Professor at Washington State University in the Paul G. Allen School for Global Animal Health. My research focuses on the epidemiology of infectious diseases, with a focus on healthcare-associated and emerging pathogens.

2. I have worked in infectious disease research for the past fifteen years and hold both MS and PhD-degrees in Epidemiology from the University of North Carolina at Chapel Hill.

3. I was involved in the response to the 2014 West African Ebola epidemic as well as the initial outbreak of Middle East Respiratory Syndrome (MERS), a novel coronavirus similar to the one responsible for COVID-19. This included leading the creation of a position paper on the role of modeling in public health response and working closely with federal agencies including the Defense Threat Reduction Agency (DTRA) and the Biomedical Advanced Research and Development Authority (BARDA). At present, my research group is one of five in the nation funded by the Centers for Disease Control and Prevention (CDC) to model the spread of healthcare-associated infections, and we are actively working on COVID-19 related research in a number of settings.

4. My C.V., attached as **Exhibit A-2**, includes a full list of my honors, experience, and publications.

5. I have not previously testified as an expert in a trial or by deposition. I have submitted a number of declarations regarding aspects of COVID-19 transmission and risks within the justice system.

## II. Opinion

6. It is my opinion that a COVID-19 infection represents a substantial health risk to Mr. Lasane, and if he is infected, he is at risk of a severe and potentially fatal outcome.

7. It is also my opinion that the current situation in the State of Florida in general and Seminole and Orange Counties in particular represent an ongoing epidemic with substantial community transmission.

8. When combined with the significant risks of acquiring COVID-19 in jail, during transfer, etc., it is likely that Mr. Lasane will not only be exposed to COVID-19 himself but represents a significant exposure risk to other participants in the trial.

1

9. Further, it is my opinion that while the Court has taken commendable steps in reducing the risk of COVID-19 during trial proceedings, the realities of the epidemiology of COVID-19 mean these measures may not be sufficient, and that ongoing community-based transmission of COVID-19 means that many of the risks to participants of the trial – including Mr. Lasane – will arise in situations outside the Court's direct control.

### III. Risk of COVID-19 Transmission in Florida and Seminole County

10. As of August 17th, there are an increasing number of new cases of COVID-19 in the state, averaging 5718 confirmed cases per day in the state over the last two weeks (excluding a one-time historical data submission on 8/11). Orange County is experiencing proportionally similar levels of COVID-19 transmission, averaging 255 cases per day as is Seminole County at 57 cases per day[1].

11. This pattern of cases is consistent with an ongoing epidemic of COVID-19 both in the state of Florida generally and in Orange and Seminole Counties in particular.

12. While these numbers do represent a substantial decrease in incidence compared to the peak of infections during the epidemic earlier this summer, this level of incidence continues to represent significant ongoing transmission in the community.

13. Model-based forecasts of COVID-19 for Florida[2] show that this is likely to continue to be true well into September. Additionally, model-based forecasts for Florida currently have a high level of uncertainty in their predictions. There is a distinct possibility of cases rising, rather than falling in the near-term future, stemming from a number of factors, including but not limited to:

    i) School and university openings, causing increased transmission in younger populations, who, while less at-risk for severe disease, are both capable of transmitting and, because of their perceived lower risk, are potentially less compliant with social distancing and masking guidelines.

    ii) Continued political pressure at the local, state and national levels to re-open when community transmission levels are still substantial.

    iii) The beginning of Fall, where the incidence of a number of respiratory pathogens increases. At present, the reason for this increase is not fully established[3], and as such

---

[1] Florida Department of Health. COVID-19: summary for Florida. http://ww11.doh.state.fl.us/comm/_partners/covid19_report_archive/county_reports_latest.pdf. Updated August 17, 2020. Accessed August 19, 2020.
[2] Reich Lab, University of Massachusetts Amherst. COVID-19 Forecast Hub. https://viz.covid19forecasthub.org. Updated August 18, 2020. Accessed August 19, 2020.
[3] E. Lofgren, N. Fefferman, Y. Naumov, J. Gorski, E. Naumova. (2007) Influenza Seasonality: Underlying Causes and Modeling Theories. Journal of Virology. 81(11): 5429-5436

it is difficult to predict whether or not COVID-19 will follow this pattern. There are both seasonal and non-seasonal strains of other coronaviruses. It is however my expert opinion that it is reasonable to assume transmission will increase as we enter the Fall months.

14. Taking this into consideration, while long term forecasts are difficult, it is likely that there will be substantial transmission of COVID-19 in Seminole and Orange Counties through the remainder of this Summer and into Fall.

15. The Florida Department of Health does not report the percentage of COVID-19 cases arising from community transmission, however the broad range of ages and the <10% of cases arising from the highest risk facility settings (long-term care facilities and correctional facilities) in both Florida as a whole and Orange County in particular suggest the majority of cases are arising from community contact[4]. This opinion is supported by a WFLA interview with University of South Florida professor Dr. Jason Salemi in a July 4th report[5]. The underlying epidemiological situation Dr. Salemi used to justify this position remains true at present.

16. Due to this widespread community transmission, jurors and officers of the court traveling to and from the courthouse are at additional risk of exposure to COVID-19 beyond what they would otherwise experience. This may be further compounded by an in-person trial causing other cascading exposures, such as the need to eat out, increased use of public transit, etc.

17. 18,473 cases of COVID-19 have been reported statewide in correctional facility staff and residents and there 22 confirmed cases in inmates and staff within Seminole County[6]. Based on reports that have been provided, 11 of these are in inmates in Seminole County Jail, with five of those cases arising in the month of July, suggesting low level but steady transmission of introduction of COVID-19 into the jail.

18. These numbers, combined with ongoing community transmission, are more than sufficient to result in a substantial risk of COVID-19 transmission to Mr. Lasane while incarcerated, being transferred between facilities and the courthouse, etc.[7].

---

[4] See 1
[5] WFLA. Florida's spike in coronavirus cases shows no signs of letting up. https://www.wfla.com/news/local-news/floridas-spike-in-coronavirus-cases-shows-no-signs-of-letting-up/. Updated July 4, 2020. Accessed August 15th.
[6] See 1
[7] E. Lofgren, K. Lum, A. Horowitz, B. Madubuonwu, K. Myers, N. Fefferman (2020) The Epidemiological Implications of Incarceration Dynamics in Jails for Community, Corrections Officer and Incarcerated Population Risks from COVID-19. medRxiv Preprint. https://www.medrxiv.org/content/10.1101/2020.04.08.20058842v2.full.pdf

19. Due to this widespread community transmission, jurors and officers of the court traveling to and from the courthouse are at additional risk of exposure to COVID-19 beyond what they would otherwise experience. This may be further compounded by an in-person trial causing other cascading exposures, such as the need to eat out, increased use of public transit, etc.

**IV. Direct Risks to Mr. Lasane**

20. COVID-19 is a complex and multifaceted disease that impacts a number of different organ systems, with a large number of complications stemming from its impact on the cardiovascular system.

21. The CDC lists the following underlying medical conditions that increase a person's risk of severe COVID-19 illness (i.e. hospitalization, admission to intensive care, requiring mechanical ventilation and/or death) with a level of evidence of "Strongest"[8]:

    i)   Serious heart conditions, such as heart failure, coronary artery disease, or cardiomyopathies
    ii)  Chronic kidney disease
    iii) COPD
    iv)  Obesity
    v)   Sickle cell disease
    vi)  Solid organ transplantation
    vii) Type 2 diabetes mellitus

22. Additionally, the CDC lists the following underlying medical conditions that increase a person's risk of severe COVID-19 illness with a level of evidence of "Mixed"[9]:

    i)   Asthma
    ii)  Cerebrovascular disease
    iii) Hypertension
    iv)  Pregnancy
    v)   Smoking
    vi)  Use of corticosteroids or other immunosuppressive medications

23. Individuals with these underlying conditions are *vastly* more likely to suffer adverse outcomes, regardless of age. In a CDC study, patients with underlying medical conditions such as those listed above required hospitalization 45.4% of the time and died 19.5% of

---

[8] Centers for Disease Control and Prevention. Evidence used to update the list of underlying medical conditions that increase a person's risk of severe illness from COVID-19. https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/evidence-table.html. Updated June 25, 2020. Accessed July 9, 2020.
[9] See 13

4

the time – rates six and twelve times higher than patients without underlying medical conditions respectively[10].

24. Based on Mr. Lasane's medical records, he is obese, with his most recent BMI measurement of 31.3 putting him over the conventional threshold of 30.0

25. Additionally, based on those medical records, Mr. Lasane is hypertensive. He had been prescribed Lisinopril, an ACE inhibitor, to treat this condition[11].

26. Mr. Lasane's medical record also reflects that he has hyperlipidemia, a potential risk factor for cardiovascular disease.

27. Mr. Lasane's medical record shows that he had a long period wherein he was prescribed terbinafine, which can have side effects impacting the function of the immune system[12]. Should he continue to be on this drug, or need to be placed on it again, this would likely increase his risk for acquiring COVID-19 as well as more severe outcomes.

28. Given Mr. Lasane's obesity and hypertension as prominent risk factors for COVID-19, he is at substantial risk of requiring hospitalization if infected with COVID-19, and in patients with similar health profiles to his, fatal infections are not unlikely, even at Mr. Lasane's relatively young age of 48.

## V. Limits of COVID-19 Protective Measures for Trial Procedures

29. Given the prevalence of COVID-19 in Orange County, it is highly likely that one or more participants in the trial process may have COVID-19. For a gathering as small as 10 people there is a 25% chance that one or more individuals have COVID-19. If this is increased to 25, 50 or 100 people that probability rises to 48%, 73% and 92% respectively[13].

30. These statistics suggest it is essential to anticipate that the measures taken by the court will have to prevent one or more potentially transmitting individuals over the course of the trial process.

---

[10] E. Stokes, L. Zambrano, K. Anderson, E. Marder, K. Raz, S. El Burai Felix, Y. Tie, K. Fullerton. (2020) Coronavirus Disease 2019 Case Surveillance – United States, January 22-May 30, 2020. Morbidity and Mortality Weekly Report. 69(24): 759-765

[11] MedlinePlus. Lisinopril. https://medlineplus.gov/druginfo/meds/a692051.html. Updated July 15, 2017. Accessed August 18, 2020.

[12] MedlinePlus.Terbinafine. https://medlineplus.gov/druginfo/meds/a699061.html. Updated Jan. 15, 2018. Accessed August, 2020.

[13] COVID-19 Event Risk Assessment Planning Tool. https://covid19risk.biosci.gatech.edu. Accessed August 18, 2020

31. The CDC classifies "Medium-sized in-person gatherings that are adapted to allow individuals to remain spaced 6 feet apart and with attendees coming from outside the local area" as "Higher Risk". While trial participants may or may not have come from outside the local area (though arguably Mr. Lasane's transfer from Seminole County Jail constitutes such a circumstance), given the severity of the epidemic within the local area, there remains a substantial risk of transmission.

32. It is also likely that the defendant and/or officers of the court will have been exposed to COVID-19 through their interactions with the incarceration system (e.g. transport to and from jail), where there is a heightened risk of COVID-19 exposure[14].

33. There is evidence that a substantial portion of COVID-19 transmission may take place during a pre-symptomatic period, when an individual may honestly not report any symptoms to an exclusion or attestation system during *voir dire* or subsequently and still present a risk of transmission to those around them[15].

34. The patterns of courtroom procedures present potential bottlenecks and sudden shifts in the density of people (i.e. during a recess or when multiple people arrive at the same time for a scheduled jury selection time, etc.). While this is an understandable logistical necessity, such surges, however limited, are high-risk for potential transmission, and make it difficult to adhere to or enforce social distancing guidelines.

35. The current effectiveness of the cloth masks typically worn outside medical settings is currently unknown – while there is some evidence that they reduce transmission from droplets[16] most of the recommendations for the use of cloth masks are based on the *possibility* of reduced transmission compared to relatively modest potential of harm given the severity of the pandemic[17].

36. Masks are difficult to use correctly. They must be sufficiently thick as to block exhaled droplets, must be properly fitted, worn over both the nose and mouth continually. These difficulties are exacerbated over longer periods of time in which masks have to be worn –

---

[14] E. Lofgren, K. Lum, A. Horowitz, B. Madubuonwu, K. Myers, N. Fefferman (2020) The Epidemiological Implications of Incarceration Dynamics in Jails for Community, Corrections Officer and Incarcerated Population Risks from COVID-19. medRxiv Preprint.
https://www.medrxiv.org/content/10.1101/2020.04.08.20058842v2.full.pdf
[15] M. Casey, J. Griffin, C. McAloon *et al*. (2020) Pre-symptomatic transmission of SARS-CoV-2 infection: a secondary analysis using public data. medRxiv preprint.
[16] A. Davies, KA Thompson, K. Giri, G. Kafatos, J. Walker, A. Bennett (2013) Testing the Efficacy of Homemade Masks: Would They Protect in an Influenza Pandemic?. Disaster Medicine and Public Health Preparedness. 7(4): 413-8
[17] C. Clase *et al.* (2020) Cloth Masks May Prevent Transmission of COVID-19: An Evidence-Based, Risk-Based Approach. Annals of Internal Medicine.

6

where the potential discomfort and difficult communicating in masks makes it likely that they will be adjusted, taken off temporarily, etc. Even in a setting where mask wearing is both mandatory and enforced, some of these difficulties will doubtlessly arise.

37. Face shields, similarly, are primarily intended to protect against large droplets striking the shield directly, as from a cough or sneeze, as well as protect the eyes. They may not provide adequate protection from suspended particles in the air, aerosolized particles, etc. One report out of Switzerland[18] suggests they are ineffective as compared to masks, and most studies out of hospital environments involve the use of other PPE at the same time and are difficult to directly interpret.

38. The imposition of the "6-foot rule" is primarily intended to prevent transmission via the same large droplets prevented by cloth masks. Smaller particles are may be capable of traveling further and remaining suspended in the air for long periods of time[19,20].

39. The maintaining of six feet of distance is primarily intended to prevent transmission from transient interactions (such as shopping) and may not be sufficient to prevent transmission due to long, sustained contact over many hours in an indoor space without purpose-built ventilation, such as a courthouse.

40. Further, there are a number of foreseeable circumstances – defense counsel conferring with their client, any need to approach the bench, etc. where social distancing may be difficult to credibly maintain. While the Court's suggested guidelines attempt to minimize these interactions, it is likely they will nevertheless occur from time to time.

41. Other physical barriers, such as the use of plastic shields or boxes around individuals, are of unknown effectiveness, especially in their ability to protect an individual from small, suspended particles (rather than relatively larger droplets). Such particles are readily generated by sneezing, coughing or talking. As with the "6-foot-rule", these risks compound over longer durations of contact between individuals.

---

[18] Gabby Landsverk. Face shields did not protect people from the coronavirus in an outbreak in Switzerland, but masks did, health officials say. Insider. https://www.insider.com/face-shields-did-not-protect-people-from-coronavirus-swiss-outbreak-2020-7. Updated July 21, 2020. Accessed August 15, 2020.

[19] Setti, L. *et al*. (2020) Airborne Transmission Route of COVID-19: Why 2 Meters/6 Feet of Inter-Personal Distance Could Not Be Enough. International Journal of Environmental Research and Public Health. 17(8): 2932

[20] Bahl, P. *et al.* (2020) Airborne or droplet precautions for health workers treating COVID-19?. The Journal of Infectious Diseases. Published ahead of print at: 10.1093/infdis/jiaa189

42. Compounding these problems, transmission is more likely to occur during events requiring a large amount of vocalization or when speech is louder than normal[21] – a foreseeable circumstance during a trial.

## VI. COVID-19 Risk Perception and Potential Juror Bias

43. While COVID-19 is a pandemic that is impacting all strata of society, the burdens of COVID-19, and thus both the risk of exposure due to participating in jury duty as well as the likely perceived risk by jurors falls particularly heavily on certain groups.

44. American Indian/Alaska Native, Non-Hispanic Black, Hispanic or Latino and Asian/Pacific Islander populations all have higher hospitalization rates for COVID-19 than Non-Hispanic White individuals, with the first three groups being especially hard hit, with rates four to five times higher than non-Hispanic white persons[22].

45. The risk of hospitalization and death due to COVID-19 also rapidly rises with age, with an individual 65 years of age being 3.78 times as likely to experience a severe infection compared to someone 30 years of age, and over 7 times as likely as someone between 18 and 29 years of age.

46. Deferral or COVID-19 related questions asked during *voir dire*, including all four questions present in the Court's order, can also reasonably be expected to have "Yes" answers occurring more frequently among certain demographic and socioeconomic groups.

47. As a result, it is likely that the potential jury pool, once COVID-19 related risks and perceived risks are taken into account, may be a biased sample of the population the jurors are being drawn from.

## VII.   Conclusion and Recommendation

48. It is my professional judgement, based on the work I have done on mitigation and containment strategies for infectious diseases, including COVID-19 that Mr. Lasane is at risk of severe complications or death.

---

[21] Asadi, S. *et al*. (2019) Aerosol emission and superemission during human speech increase with voice loudness. Scientific Reports (9): 2348
[22] Centers for Disease Control and Prevention. COVID-19 in Racial and Ethnic Minority Groups. https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/racial-ethnic-minorities.html. Updated June 25, 2020. Accessed July 9, 2020.

49. An in-person trial represents an event where there is a substantial risk of COVID-19 transmission, representing a health hazard to Mr. Lasane, the officers of the Court, and the jurors.

50. While the Court has made a commendable effort in mitigating this risk as much as possible, the nature of COVID-19 makes prolonged contact in an indoor space such as a courthouse inherently dangerous, even in the presence of those efforts.

51. It is my professional opinion that delaying in-person trials is a reasonable and responsible action considering the ongoing public health crisis that is unlikely to have resolved in the near future, and that such a delay is necessary for the health and well-being of the participants of the trial generally, and Mr. Lasane in particular.

52. Finally, should such a delay occur, it is my opinion that, if possible, Mr. Lasane should be decarcerated if possible, and remain so until the outbreak of COVID-19 in Florida has concluded or an effective COVID-19 vaccine is available to him.

I declare under penalty of perjury that the foregoing is true and correct. Executed on August 19th, 2020.

Eric Lofgren MSPH, PhD

**EXHIBIT A**
**Curriculum Vitae**

# Eric T. Lofgren, MSPH PhD

Eric.Lofgren@gmail.com   •   (509) 335-4022

---

## Research Interests

Computational and mathematical modeling of infectious diseases, with a focus on hospital epidemiology as well as emerging, enteric, and respiratory pathogens.

## Education

**Virginia Tech, Virginia Bioinformatics Institute, Blacksburg, Virginia**
**Network Dynamics and Simulation Science Laboratory**
Postdoctoral Associate: September 2013 to December 2015
Supervisor: Dr. Stephen Eubank

**University of North Carolina at Chapel Hill, UNC Gillings School of Global Public Health, Chapel Hill, North Carolina**
**Department of Epidemiology**
PhD: May 2013   Advisor: Dr. David Weber
MSPH: December 2009    Advisor: Dr. Jennifer Smith

**Tufts University, Medford, Massachusetts**
BA: January 2007
Major: Biology with Highest Thesis Honors

## Professional Appointments

**Assistant Professor, Washington State University, Paul G. Allen School for Global Animal Health**. December 2015 to present.

**Postdoctoral Research, Virginia Tech, Virginia Bioinformatics Institute, Network Dynamics and Simulation Science Lab**. September 2013 to December 2015.

**Research Assistant, UNC Gillings School of Global Public Health, Department of Epidemiology**. January 2009 to May 2009 and August 2011 to May 2013.

**Teaching Assistant, UNC Gillings School of Global Public Health, Department of Epidemiology.**  August to December 2008, August to May 2010.

**Summer Lab Manager, Rutgers University, Center for Discrete Mathematics and Theoretical Computer Science. Fefferman Lab**. May 2008 to August 2013.

**Research Assistant, Tufts University, Initiative for the Modeling and Forecasting of Infectious Disease**. August 2005 to July 2007.

## Teaching Experience

**Instructor, College of Veterinary Medicine, Washington State University.** 2018 to present.
- VetPath 571: Methods of Analysis in Epidemiology
- VetClin 570: Infectious Disease Journal Club

**Session Organizer, "A gentle introduction to mathematical modeling: Lessons from the living-dead", American Public Health Association Annual Meeting Learning Institute**. November 2011, 2012 and 2014.

**Teaching Assistant, UNC Gillings School of Global Public Health, Department of Epidemiology.** 2008 – 2010.
- EPID 722: Epidemiologic Analysis of Time-to-Event Data
- EPID 750: Fundamentals of Public Health Surveillance

## Publications

Calderwood, M.S., V.M. Deloney, D.A. Anderson, V. Cheng, S. Gohil, J.H. Kwon, L. Mody, E. Monsees, V.M. Vaughn, T.L. Wiemken, M.J. Ziegler, **E.T. Lofgren**. Policies and Practices of SHEA Research Network Hospitals during the COVID-19 Pandemic. *Infection Control and Hospital Epidemiology*. *In press.*

Slayton, R.B., J.J. O'Hagan, S. Barnes, S. Rhea, R. Hilscher, M. Rubin, **E. Lofgren**, B. Singh. 2020. Modeling Infectious Diseases in Healthcare Network Framework for Describing Multidrug Resistant Organism and Healthcare-Associated Infections Agent Based Modeling Methods. *Clinical Infectious Diseases*. *In press.*

Perkins, A.V., D.C. Sellon, J.M. Gay, **E.T. Lofgren**, D.A. Moore, L.P. Jones, M.A. Davis. 2020. Prevalence of methicillin-resistant *Staphylococcus pseudintermedius* on hand-contact and animal-contact surfaces in companion animal community hospitals. *Canadian Veterinary Journal*, 61(6): 613

Short, C.S., M.S. Mietchen, **E.T. Lofgren.** 2020. Assessing the Potential Impact of a Long-acting Skin Disinfectant in the Prevention of Methicillin-resistant *Staphylococcus aureus* Transmission. *Int. J. Environ. Res. Public Health*, 17(5): 1500

Suarez, G., O. Udiani, B. Allan, C. Price, S. Ryan, **E. Lofgren**, A. Coman, C. Stone, L. Gallos, N. Fefferman. 2020. A generic arboviral model framework for exploring trade-offs between vector control and environmental concerns. *Journal of Theoretical Biology*, 490: 110161

Chowdhury, A., **E.T. Lofgren**, R.W. Moehring, S. Broschat. 2020. Identifying Predictors of Antimicrobial Exposure in Hospitalized Patients Using a Machine Learning Approach. *Journal of Applied Microbiology*, 128(3): 688-96

Madhobi, K., M. Kamruzzaman, A. Kalyanaraman, **E. Lofgren**, R. Moehring, B. Krishnamoorthy. 2019. A Visual Analytics Framework for Analysis of Patient

Trajectories. Proc. *ACM Conference on Bioinformatics, Computational Biology and Health Informatics (ACM-BCB'19)*.

Herbert, S., **E.T. Lofgren**, K. Keyloun. 2019. Long-Acting Antibiotic Pathways Improve ED Metrics Versus Standard Care for Acute Bacterial Skin and Skin Structure Infection Treatment: A Discrete-Event Simulation. *Journal of Medical Economics*, 22(7):652-661

Halloran, M.E., K. Auranen, S. Baird, N.E. Basta, S.E. Bellan, R. Brookmeyer, B.S. Cooper, V. DeGruttola, J.P. Hughes, J. Lessler, **E.T. Lofgren**, I.M. Longini, J-P. Onella, B. Özler, G.R. Seage, T.A. Smith, A. Vespignani, E. Vynnycky, M. Lipsitch. 2017. Simulations for Designing and Interpreting Intervention Trials in Infectious Diseases. *BMC Medicine*, 15:223

**Lofgren, E.T**. 2017. Estimating the impact of past randomization changes in staff behavior in infection prevention trials: a mathematical modeling approach. *BMC Infectious Diseases*, 17:539

Omulo, S., **E.T. Lofgren**, M. Mugoh et al. 2017. The impact of fecal sample processing on prevalence estimates for antibiotic-resistant *Escherichia coli. Journal of Microbiological Methods*, 136: 71-77.

**Lofgren, E.T.**, A.M. Egizi, N.H. Fefferman. 2016. Patients as Patches: Ecology and Epidemiology in Healthcare Environments. *Infection Control and Hospital Epidemiology,* 37(12): 1507-1512.

**Lofgren, E.T.** 2016. Unlocking the black box: teaching mathematical modeling with popular culture. *FEMS Microbiology Letters*, 363(20): 1-3.

Dicks, K.V., **E.T. Lofgren**, S.S. Lewis, R.W. Moehring, D.J. Sexton, D.J. Anderson. 2016. A Multicenter Pragmatic Interrupted Time Series Analysis of Chlorhexidine Gluconate Bathing in Community Intensive Care Units. *Infection Control and Hospital Epidemiology*, 37(17): 791-7.

**Lofgren, E.T.**, K.M. Collins, T.C. Smith, R.A. Cartwright. 2016. Equations of the End: Teaching Mathematical Modeling using the Zombie Apocalypse. *Journal of Microbiology & Biology Education*, 17(1):137-142

Rivers, C.M., M.S. Majumder, D.N. Fisman, **E.T. Lofgren**. Risk of Death and Severe Disease in Patients with MERS-CoV, 2012 to 2016. *American Journal of Epidemiology*, 184(6): 460-464

**Lofgren, E.T.** 2015. Pools versus Queues: The Variable Dynamics of Stochastic "Steady States". *PLoS One,* 10(6): e0130574.

**Lofgren, E.T.** et al. 2014. Mathematical Models: A Key Tool for Ebola Outbreak Response. *Proceedings of the National Academy of Sciences*, 111(51): 18095-18096.

Fisman, D.N., C.M. Rivers, **E.T. Lofgren**, Majumder,M.S. 2014. Estimation of MERS-Coronavirus Reproductive Number and Case Fatality Rate for the Spring 2014 Saudi Arabia Outbreak: Insights from Publically Available Data. *PLoS Currents Outbreaks*.

Rivers, C.M. et al. 2014. Ebola: Models Do More Than Forecast. *Nature*, 515(7528): 492.

Halloran, M.E. et al. 2014. Ebola: Mobility data. *Science*, 346(6208): 433.
K.A. Alexander et al. 2014. What factors might have led to the emergence of Ebola in West Africa? *PLoS Neglected Tropical Diseases*.

Rivers, C.M., **E.T. Lofgren**, M. Marathe, S. Eubank, B.L. Lewis. 2014. Modeling the Impact of Interventions on an Epidemic of Ebola in Sierra Leone and Liberia. *PLoS Currents Outbreaks*.

**Lofgren, E.T.**, S.R. Cole, D.J. Weber, D.J. Anderson, R.W. Moehring. 2014. Estimating All-cause Mortality and Length of Stay in Incident, Healthcare Facility-associated *Clostridium difficile* Cases Using Parametric Mixture Models. *Epidemiology,* 25(4): 570-575.

**Lofgren, E.T.**, R.W. Moehring, D.J. Weber, D.J. Anderson, N.H. Fefferman. 2014. A Mathematical Model to Evaluate the Routine Use of Fecal Transplantation to Prevent Incident and Recurrent *Clostridium difficile* Infection. *Infection Control and Hospital Epidemiology*, 35(1):18-27.

Moehring, R.W., **E.T. Lofgren**, D.J. Anderson. 2013. Impact of Change to Molecular Testing for *Clostridium difficile* Infection on Healthcare Facility-Associated Incidence Rates. *Infection Control and Hospital Epidemiology*, 34(10): 1055-1061.

**Lofgren, E.T.** 2012. Visualizing Results from Transmission Models: A Case Against "Confidence Intervals". *Epidemiology*, 23(5): 738-741.

Chu, H., **E.T. Lofgren**, M.E. Halloran, P.F. Kuan, M. Hudgens, S.R. Cole. 2011. Performance of Rapid Influenza H1N1 Diagnostic Tests: a Meta-analysis. *Influenza and Other Respiratory Viruses*, 6(2): 80-86.

**Lofgren, E.T.**, J.B. Wenger, N.H. Fefferman, D. Bina, S. Gradus, S. Bhattacharyya, Y.N. Naumov, J. Gorski, E.N. Naumova. 2010. Disproportional Effects in Populations of Concern for Pandemic Influenza: Insights from Seasonal Epidemics in Wisconsin, 1967-2004. *Influenza and Other Respiratory Viruses*, 4(4): 205-12.

**Lofgren, E.T.**, J. Rogers, M. Senese, N.H. Fefferman. 2008. Pandemic Preparedness Strategies for School Systems: Is Closure Really the Only Way? *Annales Zoologici Fennici,* 44(6): 449-458.

**Lofgren, E.T.** and N.H. Fefferman. 2007. The Untapped Potential of Virtual Game Worlds to Shed Light on Real World Epidemics. *The Lancet Infectious Diseases,* 7(9):625-629.

**Lofgren, E.T.**, N.H. Fefferman, Y.N. Naumov, J. Gorski, E.N. Naumova. 2007. Influenza Seasonality: Underlying Causes and Modeling Theories. *Journal of Virology*, 81(11):5429-5436.

**Lofgren, E.T.**, N.H. Fefferman, M. Doshi, E.N. Naumova 2007. Assessing Seasonal Variation in Multisource Surveillance Data: Annual Harmonic Regression. *Lecture Notes in Computer Science.* BioSurveillance 2007. Eds D. Zeng et al. 4506:114-123.

## Book Chapters

**Lofgren, E.T.** 2017. Systems Dynamics Models. In *Systems Science and Population Health*. El- Sayed and Galea, eds. Oxford University Press : Oxford. pp. 77-85.

## Submitted Manuscripts

N.H. Fefferman, S. DeWitte, S.S. Johnson, **E.T. Lofgren**. Leveraging Insight from Centuries of Outbreak Preparedness to Improve Modern Planning Efforts. *In review*. Preprint available at: https://arxiv.org/abs/2005.099336

**Lofgren, E.T.**, K. Lum, A. Horowitz, B. Madubuonwu, N. Fefferman. The Epidemiological Implications of Incarceration Dynamics in Jails for Community, Corrections Officer, and Incarcerated Population Risks from COVID-19. *In review*. Preprint available at: medrxiv.org/content/10.1101/2020.04.08.20058842v2

Fefferman, N.H., **E.T. Lofgren**, N. Li, P. Blue, D. Weber, A. Yakubu. Fear, Access and the Real-Time Estimation of Etiological Parameters for Outbreaks of Novel Pathogens. *In review*. Preprint available at: medrxiv.org/content/10.1101/2020.03.19.20038729v1

**Lofgren, E.T.**, M.S. Mietchen, C.S. Short, K.V. Dicks, R.W. Moehring, D.A. Anderson. Estimating the Per-use Effectiveness of Chlorhexidine Gluconate and Mupirocin in Methicillin-resistant *Staphylococcus aureus* Decolonization in Intensive Care Units. *In submission.* Preprint available at: medrxiv.org/content/10.1101/19012732v1

C.S. Short, M.S. Mietchen, **E.T. Lofgren**. Transient Dynamics of Infection Transmission in a Simulated Intensive Care Unit. *In submission.* Preprint available at: arxiv.org/abs/1909.11878

Mietchen, M.S., C.S. Short, M. Samore, **E.T. Lofgren**. 2019. Population Structure Drives Differential Methicillin-resistant *Staphylococcus aureus* Colonization Dynamics in ICUs. *In submission*. Preprint available at medrxiv.org/content/10.1101/19002402v2.

Myers, K., **E.T. Lofgren**, N.H. Fefferman. 2018. 30 Relaxed Fit vs. 32 Slim Cut: Structural Nonidentifiability in Outbreak Models. *In submission*.

Omulo, S., **E.T. Lofgren**, S. Lockwood, et al. 2017. Saturated prevalence of antimicrobial resistance in an informal urban community. *In submission.*

## Invited Talks

*Synthesizing the Clinical Literature using Approximate Bayesian Computation*. 2019. SIAM Conference on Computational Science and Engineering. Spokane, WA.

*Meet the Professor: Building a Virtual Laboratory to Inform Improved Infection Control with Facility-Level Mathematical Modeling*. 2018. IDWeek, San Francisco, CA.

*The Patient-Patch: Hospital Epidemiology as an Ecology Problem*. 2017. National Institute for Mathematical and Biological Synthesis, University of Tennessee, Knoxville, TN.

*Adventures in Modeling for Policy*. 2017. University of Utah, Salt Lake City, UT.

*Agent-based Models and Population Health*. 2016. Center for Health and Society at the University of Copenhagen, Copenhagen, Denmark.

*Beyond Forecasting: Modeling for Decision Support, Policy and Translational Research*. 2015. Society for Vector Ecology, Albuquerque, NM.

*Epidemiology on Networks: Human and Otherwise*. 2014. Department of Mathematics, Tulane University, New Orleans, LA.

*Mathematical Modeling of In-Hospital Transmission of Infectious Diseases*. 2013. Infectious Disease Grand Rounds, Duke University School of Medicine, Durham, NC.

*Defining Epidemics: Detection, Behavior, and Intervention*. 2011. Department of Homeland Security US-Sweden Workshop "A Visualization and Analytics Approach to Flooding and Pandemics". Norrköping, Sweden.

*The Plagues of Azeroth: Outbreaks and Epidemiology in Virtual Worlds*. 2011. UNC Gillings School of Global Public Health, Chapel Hill, NC.

## Funding

U01CK000533-01                Lofgren, Eric T. (PI)          08/01/17 – 07/31/20
Centers for Disease Control and Prevention
Model-driven Surveillance and Intervention Evaluation in Highly Stochastic Healthcare Settings
Role: PI

200-2018-96423                Lofgren, Eric T. (WSU PI)      01/01/2018 – 06/30/19
Centers for Disease Control and Prevention
Identifying Predictors of Antimicrobial Exposure for Application in the Standardized Antimicrobial Administration Ratio Risk Adjustment Strategy
Role: PI of WSU Subcontract from Duke University

1UO1GH002143-01        Njenga, M. Kariuki (PI)        09/30/16-09/29/21
Centers for Disease Control and Prevention
Conducting Communicable Disease Research in Kenya
Role: Co-I

WSU College of Veterinary Medicine  Lofgren, Eric (PI)        07/01/16 – 06/30/17
Intramural Award
Modeling Emerging Infections in Frontline Veterinary Care Settings
Role: PI

## Awards and Honors

2007   University Merit Assistantship, UNC Gillings School of Global Public Health

2017   Finalist, Society for Healthcare Epidemiology of America Epi Project Competition

## Professional Memberships

2010 -   Member, Society for Epidemiological Research

            2017 – Membership Committee

2010 -   Member, Society for Industrial and Applied Mathematics

2012 -   Member, Society for Healthcare Epidemiology of America

            2017 – Journal Club

            2018 – Research Committee, Publications Committee

2015 -   Member, Association for Computing Machinery

2017 -   Member, American Association for the Advancement of Science

## Other Experience and Service

**Manuscript Referee:**  *Epidemiology, American Journal of Epidemiology, Infection Control and Hospital Epidemiology, BMJ, BMJ Open, Environmental Health Perspectives, Scientific Data, BMC Infectious Diseases, Clinical Infectious Diseases, Bulletin of Mathematical Biology, PLoS One, PLoS Computational Biology* among others.

**Editorial Boards:** *Epidemiology*

**U.S. Research Delegate:** DHS US-Sweden Workshop 'A Visualization and Analytics Approach to Flooding and Pandemics'. Norrköping, Sweden. 2010.

**Expert Witness:** American Civil Liberties Union, Defender Services Office of the Administrative Office of the U.S. Courts

## Press Coverage

**Television:** BBC World News, CBS News, Canada Television, Discovery Channel
**Radio:** BBC UK News, National Public Radio, North Carolina Public Radio, CBC, BBC4
**Print/Online News:** ABC News, ABS CBN News, Canadian Press, The Economist, Forbes, Fox News, New Scientist, Science News, Reuters, TIME, The Washington Post, FiveThirtyEight among others

# DOC. 63

# UNITED STATES OF AMERICA
## V.
## VINCE EDWARD LASANE

## CASE NO: 6:19-CR-241-ORL-37DCI

| 08/20/2020 | 63 | ORAL ORDER denying 61 Motion to Continue as to Vince Edward Lasane (1). Jury Trial set for 9/8/2020 date certain at 09:00 AM in Orlando Courtroom 4 A before Judge Roy B. Dalton, Jr. (Jury selection will be held in 3A). Signed by Judge Roy B. Dalton, Jr. on 8/20/2020. (BIA) (Entered: 08/21/2020) |

# DOC. 64

```
 1                 UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
 2                       ORLANDO DIVISION
                    CASE NUMBER 6:19-cr-241
 3
     . . . . . . . . . . . . . . . .
 4   UNITED STATES OF AMERICA,    :
                                  :
 5           Plaintiff,           :
                                  :         Orlando, Florida
 6              v.                :         August 20, 2020
                                  :         9:43 a.m.
 7   VINCE EDWARD LASANE,         :
                                  :
 8           Defendant.           :
     . . . . . . . . . . . . . . . .
 9


10             TRANSCRIPT OF STATUS CONFERENCE

11          BEFORE THE HONORABLE ROY B. DALTON, JR.

12                UNITED STATES DISTRICT JUDGE


13

14   APPEARANCES:

15

16   Counsel for Plaintiff:       Karen L. Gable

17

18   Counsel for Defendant:       Joshua R. Lukman

19

20

21   Court Reporter:     Amie R. First, RDR, CRR, CRC, CPE
                         Federal Official Court Reporter
22                       401 West Central Boulevard, Suite 4600
                         Orlando, Florida  32801
23                       AmieFirst.CourtReporter@gmail.com

24   Proceedings recorded by Realtime Stenography.

25   Transcript produced by Computer-Aided Transcription.
```

```
 1              P R O C E E D I N G S

 2                     * * * * *

 3          THE COURT:  Now, Ms. Gable and Mr. Lukman,

 4  United States versus Lasane, 19-cr-241.

 5          MS. GABLE:  Good morning, Your Honor.

 6          THE COURT:  Good morning.

 7          MR. LUKMAN:  Good morning again, Your Honor.

 8          THE COURT:  Good morning.

 9          So the Government opposes the defense motion to

10  continue?

11          MS. GABLE:  We do oppose the motion, Your Honor.

12  This case has been pending for so long, Your Honor.

13          And on February 25th, both of the parties

14  filed their exhibit list and their witness list in this

15  case.  We were prepared to go to trial March 1st or

16  whenever in March it was going to be.

17          Unfortunately, Agent Stake got very, very ill, and

18  we needed to file a motion to continue.  But we had been

19  prepared -- both parties have been prepared for trial since

20  that time.

21          I understand defense counsel's issues.  But we

22  have been prepared, and we are ready to go.  You know, I

23  have agents that are witnesses in the case.  So in terms of

24  loss of evidence or any of those, I can't say that the

25  Government is prejudiced because of this.
```

1          The only issues that we have are agents

2    continuously are backing up their mandatory training

3    because we've had a lot of continuances which is

4    understandable because of COVID-19.

5          I know that I've had examinations of defendants

6    done during COVID-19 in Orange County Jail -- I mean,

7    psychological examinations, four or five-hour examinations

8    that were able to be accomplished.  I've had proffers of

9    individuals, defendants at the Orange County Jail with

10   agents.  They were able to get that done.

11         So I understand defense counsel's concerns, but we

12   have been prepared to go to trial.

13         And if defense counsel needs to meet with his

14   client and is having a problem, perhaps one solution is to

15   have the marshals bring his client to the second floor of

16   this courthouse where we hold proffers so that he can have

17   the privacy that he needs to meet with his client.

18         But we -- this case has been continued, and we're

19   just ready to proceed.

20         THE COURT:  Okay.  Mr. Lukman?

21         MR. LUKMAN:  As the Court mentioned, a written

22   motion was filed in this case yesterday morning.  I wanted

23   that to be as robust on the details as possible to assist

24   the Court in its analysis.  The timing of that as well.

25         I wanted to include a client-specific attestation

 1   or declaration from Dr. Eric Lofgren, deputy neurologist,

 2   on the specific risk factors associated to Mr. Lasane

 3   particularly.

 4          THE COURT:  I read Mr. Lofgren's report, both in

 5   this case and in others.

 6          MR. LUKMAN:  So I think, Your Honor, there are, in

 7   a nutshell, two grounds for the defense request here.

 8          The first ground are the COVID-19 concerns.  I

 9   take that very seriously for Mr. Lasane.  I know my office

10   takes that seriously as well as far as personnel concerns.

11          The second issue does involve a lack of ability

12   for confidential client communications.  That's,

13   unfortunately, been the case since the jails went into

14   heightened --

15          THE COURT:  Is he in Orange County or Seminole

16   County?

17          MR. LUKMAN:  He's currently in Seminole County.

18          THE COURT:  I will tell you, Mr. Lukman, I just

19   spent most of the early part of this week going through

20   photographs of the Seminole County Jail, the five separate

21   facilities, five separate rooms they have available for

22   attorney-client meetings.

23          So I'm pushing back on you a little bit there

24   because I don't see anything in the Seminole County Jail

25   that suggests to me that your ability to communicate with

1   your client is compromised to the point where it implicates

2   his rights.

3            MR. LUKMAN:  We, defense counsel, were or are --

4   but I think were prohibited from entering the jail to use

5   these conference rooms.

6            I'm aware of what the Court is making mention of.

7   My colleague in the office submitted an order from the

8   other district judge in this courthouse discussing these

9   conference rooms.

10           That was news to me yesterday evening.  As of the

11  filing of this motion to continue, that was not information

12  known to myself or any of our other colleagues.

13           I think that was a case-specific resolution that

14  the other District Court came up with because my colleague

15  had similar issues regarding confidential communication.

16  So that's new and we appreciate that.

17           What's slightly disheartening about that is

18  Seminole County has been able to keep their numbers

19  relatively low with respect to positive tests.  As

20  Dr. Lofgren made mention, in July there were five positive

21  inmate tests.

22           THE COURT:  Can I stop you for a second?  Because

23  I don't want you to hear this as an accusation.  So let me

24  just preface it with that.

25           But these representations get made to me from time

 1   to time about this is happening at the jail, this is what I

 2   can do, this is what I can't do.

 3          And I will tell you that based on what I saw --

 4   now, you say this is news to you.  I don't know how it

 5   could be news to you.  You have a lot of clients there.

 6   Your office has a bunch of clients in Seminole County.

 7          You know far better than I do, or at least did,

 8   far better than I did what the accommodations are at

 9   Seminole County to see your client.

10          So when you say to me that this is news to you, it

11   may be news to you that these photographs have suddenly

12   been, you know, available, but it's not news to you what

13   the accommodations are at Seminole County.  That's not

14   correct.

15          MR. LUKMAN:  Your Honor, if I may.

16          My office meets regularly on these concerns.  None

17   of my colleagues were aware until yesterday afternoon that

18   the jail was willing to make these accommodations for

19   defense counsel to go inside the jail and have these

20   confidential communications.

21          The rooms may have existed --

22          THE COURT:  Have you ever asked?

23          MR. LUKMAN:  Yes, absolutely.

24          THE COURT:  You've asked and you were told no?

25          MR. LUKMAN:  Correct.  Office-wide.

```
 1              Experts on a case-by-case basis for evaluation
 2    purposes can make requests.  Attorneys were not to enter
 3    the jail.
 4              THE COURT:  Well, this is just a philosophical
 5    observation.  It's just -- one of the things I'm struggling
 6    with here is I'm not sure I ever anticipated that I was
 7    going to hear on behalf of an incarcerated, presumptively
 8    innocent defendant "I don't want a trial and I don't --
 9    maybe I never want a trial."
10              I mean, what you're suggesting, what your proposal
11    is to wait until when?  And with all due respect to
12    Mr. Lofgren -- and I do have respect for him.  I mean, I'm
13    not an epidemiologist.  I certainly am respectful of his
14    professional expertise.
15              That said, I'm not at all persuaded that he's
16    qualified to talk about jury bias and perception and what
17    jurors are going to think about screens.
18              He doesn't have any -- I looked at his resume.  I
19    don't see anything in there that jumps out at me that
20    suggests that he has the slightest idea what he's talking
21    about any more than any other man on the street might.
22              So you don't need advice from me; but my advice,
23    unsolicited, is he should cabin his opinion to something
24    that he knows about and not start talking about whether the
25    jury pool is going to be representative or whether or not
```

 1    the jurors are going to be biased by having to wear a mask

 2    and face shield.

 3              And he also doesn't know other than what he's been

 4    told by your office what protocols I intend to use in order

 5    to try to provide for the health and safety of the people,

 6    which I'm also concerned about.

 7              So these are not decisions that are just being

 8    made willy-nilly.  As I've said before, the public has a

 9    right to a speedy trial.  The public has a right to a

10    disposition of these charges.  They were brought by the

11    United States.

12              As time goes on, witnesses' memories get weak,

13    evidence degrades, the ability to obtain a successful

14    prosecution is prejudicially impacted.  That affects the

15    interest of the public.  That has to be taken into account.

16              And we have, all of us that are officers of the

17    court -- and certainly I do as a judicial officer -- have

18    an obligation to make sure that we preserve, protect, and

19    defend the Constitution and the constitutional rights of

20    the people involved.

21              Mr. Lasane -- you know, I don't want to do

22    anything that jeopardizes Mr. Lasane's health.  And, again,

23    I'm not an epidemiologist.

24              But I'm not seeing anything which suggests to me

25    that his health is more significantly compromised by giving

```
 1   him his right to a jury trial, which he's entitled to and

 2   he's asked for, as opposed to leaving him for some

 3   indeterminate period in the Seminole County Jail.

 4         I sometimes say when people ask me about it, you

 5   know, it's akin to being in Guantanamo.  You're going to be

 6   in Guantanamo and never get a trial date, have no idea

 7   what's going on?

 8         Anyway, I don't mean to get off on that jag except

 9   to tell you that nothing is perfect.  And trying this case

10   in these sort of circumstances is probably going to require

11   a lot of flexibility on the part of everybody involved,

12   myself included, the lawyers, trying to make sure everybody

13   stays safe.  Nobody wants to jeopardize somebody else's

14   health.  But indefinitely continuing jury trials is simply

15   not an option.

16         So with all due respect to Mr. Lofgren, on that

17   basis, I'm not inclined to grant your motion to continue on

18   the basis of the COVID health concern.

19         And I think I cut you off.  You said you had

20   another ground or condition to that.

21         MR. LUKMAN:  Oh, I was just going to say I am

22   confident that the access to these conference rooms that

23   the Court made mention of was news to my office as a whole

24   yesterday afternoon.

25         We were consistently denied access beyond the
```

 1   conditions mentioned in my motion.  I just want to be very

 2   clear on that.  It's not personally I was not in the loop.

 3   It was a jail policy that changed, because we were all

 4   rather excited, to be honest, Your Honor, yesterday

 5   afternoon about the opportunity to meet with our clients.

 6         But I was going to suggest that it's slightly

 7   disheartening just because Seminole has been doing a very

 8   good job of keeping their numbers low compared to the

 9   Orange County Jail.  And I think part of that is because of

10   their bubble, so to speak, the protection they've

11   incorporated, although that's posed problems for

12   attorney-client communications, especially privileged

13   communications.

14         But that kind of goes into the segue to answer the

15   Court's question, the second issue was confidential

16   communications at least up until yesterday afternoon.  And

17   Ms. Gable and the Government is correct.  We were gearing

18   up for the trial in this case, save for the Government's

19   emergency motion which the defense did not oppose at the

20   time because of someone's illness.  Now we're trying to

21   protect everyone's health.

22         But I would just suggest while we were gearing up,

23   like any contest, whether by sports analogy and in the

24   courtroom, I don't think it's fair to say because they were

25   prepared and geared up more than six months ago they don't

 1   need to refresh, regroup, or reconsult on the trial

 2   strategy and preparation more immediately preceding the

 3   trial date.

 4           THE COURT:  Okay.  Well, today is the 20th of

 5   August.  This is not a complex case.  I understand it's a

 6   significant case.  Don't get me wrong.  It's certainly

 7   significant to Mr. Lasane.  But from an evidentiary

 8   standpoint, it's not a complicated case.  It's not a

 9   document-intensive case.

10           It's also not a case that's going to involve a lot

11   of moving parts in terms of assessing what the Government's

12   case is going to consist of or what the cross-examination

13   will be or, frankly, any of the other things that I

14   sometimes see that warrant an extended period of time to

15   allow you to consult with your client.

16           So I'm not -- I'm confident that you're going to

17   be able to communicate effectively with your client between

18   now and the trial date in order to be prepared to go.

19           I'm looking at the week of September the 7th

20   through the 10th.  Does that pose any problems for the

21   Government, Ms. Gable?

22           MS. GABLE:  It does not, Your Honor.  I believe

23   the 7th may be a holiday.

24           THE COURT:  Yeah.  I just meant that week.  On the

25   7th, is that Labor Day?

```
 1                MS. GABLE:  Yes.

 2                THE COURT:  So first day of that week was the

 3      8th.

 4                MR. LUKMAN:  Your Honor, the defense would request

 5      potential consideration for the latest date in the

 6      September trial term if the Court is denying the defense

 7      motion for a continuance.

 8                (Discussion off the record.)

 9                THE COURT:  How long is the Government's case

10      anticipated to take, Ms. Gable?

11                MS. GABLE:  Your Honor, we anticipate that we have

12      two and a half days of testimony.  I know the defense

13      counsel has a case, and we anticipate that their case will

14      be about a half a day.

15                MR. LUKMAN:  That's exactly right.

16                THE COURT:  So I've looked, Mr. Lukman, to try to

17      accommodate you at a later date, and I just don't have one,

18      unfortunately.

19                So I'm going to set you for jury selection to

20      commence on Tuesday, September the 8th at 9:00.  And

21      then we'll have Tuesday, Wednesday, Thursday, and Friday

22      available to try the case if it does take four trial days.

23                Anything else we can take up in connection with

24      the case?

25                Let's talk a little bit about the mechanics,
```

 1  Ms. Gable and Mr. Lukman, just so you'll have a better feel

 2  for what I anticipate the protocol is going to be as far as

 3  jury selection.

 4          We're going to -- jury selection is going to take

 5  longer than usual because we're going to bring the panel in

 6  in smaller groups.  We're going to do jury selection down

 7  in the ceremonial courtroom on 3A so that we have more room

 8  to spread people out.

 9          We have a sound system, different sound system

10  that we'll be utilizing down there that will allow the

11  jurors to use overhead microphones and not have to pass the

12  microphone amongst themselves to respond to the Court's

13  voir dire examination.

14          I think -- don't hold me to the number.  I think

15  we're going to bring these folks up in groups of 19.  I

16  think that's the way the math works out that we can get

17  19 prospects in there at a time.

18          And so we'll go through those groups of 19.  The

19  Government, of course, has six peremptory challenges.  The

20  defense has ten.  My usual practice, as you both know, is

21  to permit backstriking.  We're not going to be able to do

22  that.

23          So we're going to have groups of 19.  We're going

24  to examine each of those groups of 19.  As I said, don't

25  hold me to the number.  It might be 18.  It might be 21.

```
 1   But I think it's 19.

 2        Once those groups have been examined, then I'll

 3   call on the defense to go first and exercise peremptory

 4   challenges as it relates to that group of 19.  And we'll

 5   take up challenges of cause obviously first with respect to

 6   that panel, and then we'll move to peremptory challenges.

 7        If in that group of 19, if you do not exercise a

 8   peremptory challenge, then that juror will be seated.  All

 9   right?  So there will be no opportunity to backstrike or to

10   remove somebody from group one once we've moved onto group

11   two.

12        Does that make sense?

13        MR. LUKMAN:  It does.

14        THE COURT:  Okay.  And then we'll continue through

15   the groups until we've got our jury of 12 plus two

16   alternates.  So whether we get that in one grouping, two

17   groupings, or three groupings, we'll move along in those

18   groups of 19 until we've got a jury constituted and

19   selected.

20        Then once the jurors are sworn, we'll move back up

21   here for the trial of the case.  Each of the jurors will be

22   outfitted with a clear face shield.  Everybody in the

23   courtroom will be required to be masked and to maintain

24   social distance.

25        The jurors will be seated in the jury box.
```

```
 1   They'll be spread out a little bit.  And we'll use these
 2   plexiglass separation barriers.  We won't use each one of
 3   these boxes.  Some of the jurors will be seated in the
 4   back.
 5          I expect that I will probably inquire of the
 6   jurors as to whether they have a preference in terms of
 7   their level of comfort.  I don't know if people might feel
 8   claustrophobic sitting in those chairs, whether they might
 9   prefer to be in the back gallery.  But we will spread the
10   jurors out and/or give them plexiglass covering.
11          The witnesses will all be required to wear masks
12   coming into the courtroom, and they'll have clear face
13   shields.  They'll be permitted to remove their masks during
14   their testimony.  That barrier will remain in place.
15          We will also ask the lawyers to use a clear face
16   shield when they are conducting their examination of
17   witnesses.  The lawyers will be permitted to pull their
18   mask down during the examination of witnesses but not
19   otherwise.  And you have to keep a clear face shield in
20   place at all times.
21          We will not have sidebars.  So if you have an
22   objection that you want to make and you want to approach,
23   you'll need to make that request; but you should anticipate
24   that the request for a sidebar is going to be denied.  I'll
25   give you the option, then, of bringing it up with me during
```

```
 1   one of the breaks, whether it's the morning break or

 2   afternoon break, or maybe take a break if you think it's

 3   important enough.

 4            But just know that I don't think there's a way.

 5   We haven't figured out a way to safely do sidebars, which I

 6   don't really do much of anyway as you know.

 7            But I'm trying to think what else I can tell you.

 8            In terms of deliberations, we're not going to use

 9   the jury deliberation room.  We have a couple of separate

10   -- we have three possibilities for deliberations and jury

11   breaks.

12            During breaks, the jurors are going to be able to

13   either utilize the unoccupied magistrate courtroom on the

14   fifth floor.  I've forgotten if that's 5C.  I don't

15   remember if it's 5D or C.

16            We have a magistrate judge's courtroom that's

17   currently unoccupied.  We also have set aside for juror

18   breaks and deliberation the judges conference room on the

19   third floor which is large and has plenty of room for the

20   jurors to maintain social distance while they are

21   deliberating.

22            And then the other option that we have is to clear

23   this courtroom and to allow the jury deliberations to take

24   place inside the courtroom with everyone else locked out,

25   the CSOs posted at all the entrances.  So one of those,
```

1    depending on whether or not we have other cases ongoing.

2         My preference is to use the unoccupied magistrate

3    judge's courtroom if it's not spoken for because that has

4    -- it's a way from here.  It gives the jurors a chance to

5    stretch out, and they can stay socially distanced.  And

6    they have all the amenities in there they might need.

7         So questions, Ms. Gable?

8         MS. GABLE:  Will the Court be supplying the face

9    shields for the parties?

10        THE COURT:  Yes.

11        MS. GABLE:  And will we be permitted to wear the

12   face shields during opening and closings as well?

13        THE COURT:  Yes.  Obviously, it's even more

14   important that you remain at the podium.

15        And then we're going to have wipes like I have

16   there which I'm going to encourage all of the lawyers to

17   use both coming and going.  So if you would -- in

18   anticipation of somebody else coming to the podium, if you

19   can wipe it down when you leave.  And then I'll try to be

20   vigilant to make sure if somebody forgets that I remind the

21   next person coming to the podium to wipe that down when

22   they arrive.

23        We're not going to allow witnesses to conjugate in

24   the witness rooms outside because it's not large enough for

25   them to safely socially distance.

```
 1              So I'm going to ask the lawyers -- and so,
 2    Ms. Gable, since the Government's witnesses will be
 3    arriving first, just please make sure you stress with your
 4    witnesses that they need to be vigilant about maintaining
 5    their social distance.  And you should have somebody from
 6    your office available to run witnesses in and out from a
 7    more remote spot than we're used to.  So just be aware of
 8    that.
 9              And, Mr. Lukman, obviously when your day comes, if
10    you have witnesses you need to give them similar
11    instructions.
12              I think, but don't know for sure, but I think that
13    Judge Mendoza is going to be starting a case on the
14    31st of August.  You might want to drop in and take a
15    look or have somebody from your office sit in to just see
16    how that goes.
17              I can't promise you I'll do things the same way
18    Judge Mendoza does.  I don't really know exactly how he
19    runs things.  But it might give you some additional
20    information at least in terms of the jurors coming in and
21    the jury selection process, that sort of thing.
22              Because of the need to make sure we provide public
23    access, I don't anticipate closing the courtroom.  I think
24    we'll have -- I don't anticipate a lot of spectators for
25    this case.  If I'm wrong, you all should let me know.
```

1          But my expectation is that I'll be able to safely

2     divide people by using, as I look to the courtroom, to my

3     left for spectators or for people that are here on behalf

4     of the defendant; the right side, the front portion of that

5     for any jurors that are uncomfortable being in the box that

6     we need to put in the front in order to maintain some

7     distance.  And then we'll try to keep those groups apart.

8          And as I said, I'll have some -- the seats will be

9     designated back there in the back as to where you can sit

10    and where you can't.  So we'll have -- our staff will come

11    in here and do some of that work before you all arrive.

12         And I know there are things -- I said this to my

13    colleagues and I'll say it to you.  I'm sure you have

14    questions.  I probably don't have answers.  I suspect that

15    there are things that are going to arise that we have not

16    anticipated.

17         We just have to try to deal with those as they

18    develop.  And if I'm forgetting something, I don't know

19    what it is.  But in any event, just know that this is a

20    little bit of uncharted territory for all of us.

21         And I wish more than anything that we were trying

22    cases in the ordinary way with, you know, a large group

23    coming in and with jury selection the way we've always done

24    it.  And I know you all would be more comfortable that way.

25    I would certainly be more comfortable that way.  But it's

 1    just not an option.

 2            MR. LUKMAN:  May I, Your Honor, inquire, follow-up

 3    questions?

 4            THE COURT:  Yes.

 5            MR. LUKMAN:  I'm not sure if I heard the Court

 6    correctly, but did the Court anticipate each follow-up

 7    witness to sanitize themselves, or was there a designated

 8    individual who will be handling that?

 9            THE COURT:  I'm going to ask my courtroom deputy

10    to have those wipes available.  And not that she doesn't

11    have enough to do already, but we're going to try to make

12    sure that in between each witness that the area gets wiped

13    down and is disinfected.

14            MR. LUKMAN:  And will the Court be issuing any

15    case-specific written protocols on the docket?

16            THE COURT:  I know Judge Byron did that.

17            MR. LUKMAN:  Right.  And I think that's what

18    Dr. Lofgren was referring to when he was referring to

19    sample protocols, was Judge Byron's order.

20            THE COURT:  Yeah.

21            I'm not opposed to doing it -- well, I'm mildly

22    opposed to doing it for this reason:  Because I don't know

23    exactly what's going to happen.  And if I put it in an

24    order, then I feel like that, you know, it restricts my

25    flexibility to maybe -- maybe as I start doing it, I think

```
 1   this -- I get a better idea.  You know, there's a better

 2   way to get this accomplished.

 3         So I'll think about it.  Would you like one?

 4         MR. LUKMAN:  The defense is requesting it.  Yes,

 5   Your Honor.

 6         And I understand the Court's position on it and

 7   will rule accordingly.

 8         THE COURT:  Well, I mean -- and, again, I say this

 9   not -- I don't mean it as a criticism.  I have great

10   respect for the Federal Defender's Office and the work that

11   you do as well as the Government.

12         But I surely know that as soon as I issue an order

13   of protocol that Dr. Lofgren, Mr. Lofgren is going to find

14   fault with it because I would find fault with it because it

15   cannot possibly be comprehensive.  And if there were a way

16   to comprehensively ensure everyone's safety other than

17   don't leave your home, don't participate, that's not an

18   option.  So if that's -- you take my point.

19         But I understand that the defense would like to

20   have one because, A, it would give you some idea of what

21   you can count on; and, B, I mean, to be practical about it,

22   it gives you some opportunity to have something to throw a

23   stone at.

24         And I'm not objecting -- I'm not self-conscious

25   about it.  I'm not defensive about having stones thrown at
```

1  it if you have a better idea or if something in there is,

2  you know -- if there's a better way to do it, I'd love to

3  hear about it.

4  　　　　But what I know we can't do is indefinitely

5  continue the criminal justice system as it relates to jury

6  trials.  That, I know I'm unwilling to do.

7  　　　　MR. LUKMAN:  Two more, if I may.

8  　　　　THE COURT:  Yeah.

9  　　　　MR. LUKMAN:  I appreciate the Court's time and

10  patience with these.

11  　　　　THE COURT:  Sure.

12  　　　　MR. LUKMAN:  This is a good segue of people coming

13  in.  I know the Court in its prior order at doc 59 sua

14  sponte review of the case and continuance acknowledged its

15  concern for ensuring an appropriate cross-section.

16  　　　　And the defense would move, unless the Court

17  intended to do this -- what's the status of questionnaires

18  being disclosed to the defense?

19  　　　　THE COURT:  Yeah.  Good question.

20  　　　　So the COVID questionnaires are being returned --

21  I can't remember the number of days.  But they come back --

22  they can either be done electronically or they can be

23  returned manually.

24  　　　　Then what Jury Assembly is doing, then, is they're

25  bringing all of those other than the standard excusals

 1   which would be the statutory excusals, over 70 years old,

 2   taking care of -- child care problems, but the answers to

 3   the COVID questions are then going to the presiding judge.

 4          I personally have no problem making those

 5   questionnaires available to the defense and the Government

 6   so that you all can see who I have deferred, but I don't

 7   intend to have a hearing to go through each of those COVID

 8   deferral requests.  I'm going to make a judgment as to

 9   whether or not I think those people should be deferred

10   based on what's in their questionnaire.

11          But you all can look at them and obviously if you

12   have an objection or if you think I've deferred somebody or

13   not deferred somebody inappropriately, I think you should

14   have an opportunity to make a record of that.

15          I'm not going to let you -- what I'm going to

16   instruct Jury Assembly to do is when those things are

17   returned to give you all an opportunity to come down and

18   inspect them.  But I'm not going to make copies of it

19   because I want to balance the privacy of the jurors,

20   especially those jurors that are not being selected, that

21   are being deferred, they're not going to be on your panel

22   anyway.

23          So the only objection would be that you think I

24   deferred somebody who should have been on the panel who

25   might have impacted or might implicate the representative

```
 1    nature or the demographics of the panel.  I can certainly
 2    see that you might be interested in whether there are more
 3    African-American deferrals or more elderly deferrals or
 4    more Asian deferrals.  And, again, that's in the category
 5    of -- we have no idea.  Frankly, we'll have to see.
 6            But my own view is that I think you probably need
 7    access to that information in order to make an informed
 8    assault, for lack of a better word, on the representative
 9    makeup of the panel.
10            So we'll see.  It may turn out not to be an issue,
11    but if it is an issue -- so what I'm going to do is I'm
12    going to instruct Jury Assembly to let me know when they
13    anticipate the summons going out for September the 8th.
14    It will be pretty quickly here.
15            I don't know if you know off the top of your head.
16            THE DEPUTY CLERK:  They should do it by the end of
17    this week.
18            THE COURT:  So the summons will go out likely by
19    the end of this week.  And then as soon as the COVID
20    responses are available and I've had a chance to review
21    them, I'll ask Ms. Acevedo to give you a call and let you
22    know that they are available at Jury Assembly.  And then
23    you can come over and inspect the requests for deferral
24    that are based on COVID.
25            We've modified the questionnaire a little bit as
```

1    of last week based on my first experience with some of

2    those coming back.

3            I know you all have seen, I suspect, the original

4    questionnaire.  Am I correct on that?

5            MS. GABLE:  Yes.

6            THE COURT:  Mr. Lukman?

7            MR. LUKMAN:  I believe so.

8            THE COURT:  Okay.  So it's nothing drastic in the

9    change.

10           The only change is we added -- question three

11   asked the jurors to answer yes or no as to whether they

12   suffered from a pre-existing condition that put them at

13   higher risk of COVID.  And it was just a yes or no.  It

14   didn't ask them what.

15           So the concern was that as some of these things

16   came in that many of these jurors probably really don't

17   know whether their pre-existing condition is something that

18   puts them at higher risk.  They might think it is or they

19   might feel like that it is something that disqualifies

20   them, that doesn't disqualify them.

21           And I'm using "disqualify" based on the CDC

22   guidelines that would actually put them at great risk.

23           So we added 3-A to ask them to tell us what it is.

24   So if you're asthmatic or if you've got COPD or if you're

25   diabetic or if you had a lung transplant, tell us what it

1  is that you think puts you at higher risk.

2        And then we've also added a question, I think it's

3  now question number five, where we ask the jurors to tell

4  us whether they were requesting a deferral based on a yes

5  answer.

6        Because when I went through the last batch, I

7  don't want to say it was clear, but it was at least -- the

8  question arose in my mind with respect to some of the

9  answers, people answered yes -- for instance, I live in a

10 home with someone that's vulnerable; but they weren't

11 really asking to be deferred, if you take my point.

12       Yes, I live with -- I live with my parents who are

13 over 65, but I'm not asking to be deferred from jury duty.

14 We didn't really give them that option.  So we added a

15 question that says, essentially, if you did answer yes to

16 any of these questions, are you asking to be deferred based

17 on COVID concerns, yes or no.  So somebody could answer

18 yes, I live in a home with vulnerable people; but no, I'm

19 not asking to be deferred for that.

20       So those changes.

21       And I don't know if you have that available.

22 Ms. Acevedo may be able to print one of those out and give

23 it to you before you leave today if you'd like to have

24 that.

25       MR. LUKMAN:  That would be great, if possible.

1          MS. GABLE:  Yes.

2          THE COURT:  And the new one will be the one that's

3   going out?

4          THE DEPUTY CLERK:  Yes.

5          THE COURT:  Okay.  So we're not going to -- we

6   have some that are already out that are the old form.  But

7   obviously the ones that are out are out.  But everything

8   that's going out from this point is going to use this

9   slightly modified one.

10         MR. LUKMAN:  Your Honor, my third and final

11  inquiry on final protocol pertains kind of specifically to

12  defense table counsel communications.

13         THE COURT:  Right.

14         MR. LUKMAN:  I'm not sure if the Court had any --

15  I know it's a little bit of play it by ear, but are there

16  any anticipated protocols for how we'll distance, we'll

17  communicate while maintaining confidentiality and so forth?

18         THE COURT:  Yeah.  I'm going to give you the

19  opportunity, Mr. Lukman, to bring to my attention if you

20  have a need to communicate with your client during the

21  course of the proceedings.  And I will make sure that I

22  make that happen in a way that's confidential.

23         The biggest challenge obviously are the --I guess

24  in the good old days you being able to lean over and

25  whisper to your client or have your client lean over and

```
 1   whisper to you.  That's probably not going to be possible

 2   unless you know the lawyer and/or the client want to

 3   proceed that way.  And everyone is going to be masked.

 4            But I'm going to be making some remarks to the

 5   jurors during the jury selection process pointing out to

 6   them that some things are different and we'll have people

 7   sitting in places where they wouldn't ordinarily sit.  And

 8   Mr. Lasane's lawyer may not be sitting right next to him.

 9   It doesn't mean you should take anything from that except

10   that we're trying to keep people safe.

11            And it may be necessary for me to interrupt things

12   from time to time to let the Government talk to her

13   representatives or to let the defense talk to Mr. Lasane.

14            So things are going to go maybe a little slower

15   than they might expect, and I need their patience and

16   understanding with that.  So I'm going to do whatever I can

17   to try to lay the groundwork for that going forward.

18            I guess the short answer to your question is, I

19   don't know a good solution to that problem.  I've

20   entertained several ideas.

21            This sort of separation panel maybe being placed

22   between your chairs and the chair of the defendant, I'm not

23   sure I would want that or not if I were a defense lawyer.

24            So I don't want to be presumptuous and say, you

25   know, I mean, we -- if you or Ms. Gable, if you would like
```

```
 1   to have one of these separators so you can separate
 2   yourself or your agent, my anticipation was that I would
 3   have the client sitting at one table and the lawyer sitting
 4   at a different table so that you maintain some distance but
 5   there was not actually a physical barrier between you.
 6           The client can obviously and these case agents can
 7   obviously write notes and pass notes.  It's not perfect
 8   but -- so that's kind of in the category of I don't really
 9   know yet.
10           But I appreciate the fact that if I were in either
11   of your shoes I would be a little bit worried about how I
12   was going to talk to my folks during the course of the
13   trial.
14           All I can tell you is that I'm going to be as
15   flexible as I can be to try to accommodate you if something
16   arises and you feel like you need to have a conversation
17   with them and you can't do it without interrupting the
18   proceedings, then we'll interrupt the proceedings.
19           MS. GABLE:  Your Honor, I would prefer to have the
20   case agent at the same table.  We've been having hearings
21   and operating that way.  We wear masks.  And it's been
22   fine.
23           THE COURT:  Okay.  That's fine.
24           I'm not going to require -- the only thing I'm
25   going to require is that you maintain social distance.  You
```

```
 1   can do that sitting at one table.
 2            The other thing that I want you all to know is
 3   that if there's something that you want me to -- that
 4   you're concerned about in terms of the appearance or
 5   something that's maybe hanging out there that's not been
 6   addressed, just tell me about it.  Unless I think it's
 7   inappropriate or wrong, you know, no reason I wouldn't do
 8   it.
 9            I'm going to do everything I can to try to think
10   of everything, but two minds are better than one.  If you
11   all think that something should be addressed with the panel
12   that I haven't taken up with them, then just raise your
13   hand and let me know.  Again, unless I think it's not
14   appropriate, there's no reason I wouldn't do it.
15            MR. LUKMAN:  I might have another inquiry.
16            Heaven forbid --
17            THE COURT:  I started to warn you when you said
18   this is my last question.
19            MR. LUKMAN:  I know.  Rookie mistake.  I jinxed
20   myself.
21            Heaven forbid, if any circumstances happen to
22   worsen, if access of a jail changes from what it is now, if
23   Mr. Lasane who has some brief symptoms were to be diagnosed
24   or were to get sick, does the Court want a written motion
25   to reach out to the deputy or what's the Court's preference
```

```
 1   for any updates on any potential but hopefully not wrenches
 2   in the gears?
 3           THE COURT:  Well, so the answer is I would need
 4   both.  If you're looking for a continuance, you're going to
 5   need to file a written motion and you're going to need to
 6   articulate your grounds and probably legal memorandum in
 7   support of your request.
 8           That said, if you're working on your motion, I
 9   would always be appreciative if you call my courtroom
10   deputy and said we're going to be moving to continue.  I
11   don't have the motion finished yet but it's coming.
12           The same for the Government as well.
13           MS. GABLE:  Should we report directly to
14   Courtroom 3A on the first day of trial?
15           THE COURT:  Yes.  Courtroom 3A on the first day of
16   trial.
17           MS. GABLE:  But we will be trying the case here.
18           THE COURT:  Correct.
19           We're going to do jury selection only there partly
20   -- for two principal reasons.
21           One is that we have more room there.  We can
22   spread people out.  We're going to have -- the district
23   judges are all -- we're trading off on jury selection days
24   so that we're not picking a jury on the same day so that we
25   can use 3A.
```

 1            The other advantage is that we can take jurors, if

 2    need be, up the stairway to 3A and not have to put them in

 3    the elevator.  Once they're selected, obviously then they

 4    can ride the elevator to be here.  But we can bring the

 5    group of 12 to 14 up much more efficiently by spreading

 6    them out as much as we can in several groups of 20.

 7            All right.  As I said, I'm sure there are more

 8    questions, but we've been through a lot of them today.

 9            So I'll look forward to seeing you all.

10            And as I said, you might want to pay attention

11    with what happens with Judge Mendoza's panel so we'll have

12    some idea.  He got the short straw, I guess, being the

13    out-front guy.

14            All right.  I'll see you all then, if not before,

15    the morning of the 8th in Courtroom 3A for jury

16    selection.

17            MR. LUKMAN:  Your Honor, may the record reflect

18    the defense's objection respectfully to the Court's denial

19    of the motion?

20            THE COURT:  Yes, it will.

21            (Proceedings adjourned at 10:24 a.m.)

22                         *****

23

24

25

```
1                    C E R T I F I C A T E

2

3          I certify that the foregoing is a correct

4    transcript from the record of proceedings in the

5    above-entitled matter.

6

7    August 21, 2020

8

9        s\  Amie R. First
     _____
     Amie R. First, RDR, CRR, CRC, CPE
10   Federal Official Court Reporter
     United States District Court
11   Middle District of Florida

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# MOTION FOR LEAVE TO PROCEED
# *IN FORMA PAUPERIS*

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

### APPEAL NO.
### L.T. NO. 6:19-CR-241-ORL-37DCI

---

### IN RE: VINCE EDWARD LASANE,

### Petitioner

---

### THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF FLORIDA

---

### MOTION FOR LEAVE TO PROCEED *IN FORMA PAUPERIS*

---

**JAMES T. SKUTHAN**
**Acting Federal Defender**

**JOSHUA R. LUKMAN**
**Assistant Federal Defender**
**FL Bar Number: 0088213**
**201 S. Orange Ave., Ste. 300**
**Telephone: 407-648-6338**
**joshua_lukman@fd.org**
**Counsel for Petitioner**

**ALI KAMALZADEH**
**Assistant Federal Defender**
**FL Bar Number 115995**
**201 S. Orange Ave., Ste. 300**
**Telephone: 407-648-6338**
**ali_kamalzadeh@fd.org**
**Counsel for Petitioner**

Appeal No.

*In Re:  Vince Edward Lasane*

CERTIFICATE OF INTERESTED PERSONS

The persons listed below have an interest in the outcome of this case:

Dalton, Jr., The Honorable Roy B.

Gable, Karen L.

Irick, The Honorable Daniel C.

Kamalzadeh, Ali

Kidd, The Honorable Embry J.

Lasane, Vince Edward

Lukman, Joshua R.

Reyes, Karla Mariel

Skuthan, James T.

Smith, The Honorable Thomas B.

Sweeney, Sara C.

Appeal No.

*In Re:  Vince Edward Lasane*

CERTIFICATE OF INTERESTED PERSONS – *CONT'D*

No publicly traded company or corporation has an interest in the
outcome of this appeal.