**Exhibit F**

```
 1                UNITED STATES DISTRICT COURT
                 MIDDLE DISTRICT OF FLORIDA
 2                     ORLANDO DIVISION
                  CASE NUMBER 6:19-cr-241
 3
     . . . . . . . . . . . . . . . .
 4   UNITED STATES OF AMERICA,      :
                                    :
 5              Plaintiff,          :
                                    :         Orlando, Florida
 6              v.                  :         August 20, 2020
                                    :         9:43 a.m.
 7   VINCE EDWARD LASANE,           :
                                    :
 8              Defendant.          :
     . . . . . . . . . . . . . . . .
 9

10           TRANSCRIPT OF STATUS CONFERENCE

11      BEFORE THE HONORABLE ROY B. DALTON, JR.

12             UNITED STATES DISTRICT JUDGE

13

14   APPEARANCES:

15

16   Counsel for Plaintiff:       Karen L. Gable

17

18   Counsel for Defendant:       Joshua R. Lukman

19

20

21   Court Reporter:     Amie R. First, RDR, CRR, CRC, CPE
                         Federal Official Court Reporter
22                       401 West Central Boulevard, Suite 4600
                         Orlando, Florida 32801
23                       AmieFirst.CourtReporter@gmail.com

24   Proceedings recorded by Realtime Stenography.

25   Transcript produced by Computer-Aided Transcription.
```

```
 1                    P R O C E E D I N G S

 2                         * * * * *

 3          THE COURT:  Now, Ms. Gable and Mr. Lukman,

 4   United States versus Lasane, 19-cr-241.

 5          MS. GABLE:  Good morning, Your Honor.

 6          THE COURT:  Good morning.

 7          MR. LUKMAN:  Good morning again, Your Honor.

 8          THE COURT:  Good morning.

 9          So the Government opposes the defense motion to

10   continue?

11          MS. GABLE:  We do oppose the motion, Your Honor.

12   This case has been pending for so long, Your Honor.

13          And on February 25th, both of the parties

14   filed their exhibit list and their witness list in this

15   case.  We were prepared to go to trial March 1st or

16   whenever in March it was going to be.

17          Unfortunately, Agent Stake got very, very ill, and

18   we needed to file a motion to continue.  But we had been

19   prepared -- both parties have been prepared for trial since

20   that time.

21          I understand defense counsel's issues.  But we

22   have been prepared, and we are ready to go.  You know, I

23   have agents that are witnesses in the case.  So in terms of

24   loss of evidence or any of those, I can't say that the

25   Government is prejudiced because of this.
```

```
 1              The only issues that we have are agents
 2    continuously are backing up their mandatory training
 3    because we've had a lot of continuances which is
 4    understandable because of COVID-19.
 5              I know that I've had examinations of defendants
 6    done during COVID-19 in Orange County Jail -- I mean,
 7    psychological examinations, four or five-hour examinations
 8    that were able to be accomplished.  I've had proffers of
 9    individuals, defendants at the Orange County Jail with
10    agents.  They were able to get that done.
11              So I understand defense counsel's concerns, but we
12    have been prepared to go to trial.
13              And if defense counsel needs to meet with his
14    client and is having a problem, perhaps one solution is to
15    have the marshals bring his client to the second floor of
16    this courthouse where we hold proffers so that he can have
17    the privacy that he needs to meet with his client.
18              But we -- this case has been continued, and we're
19    just ready to proceed.
20              THE COURT:  Okay.  Mr. Lukman?
21              MR. LUKMAN:  As the Court mentioned, a written
22    motion was filed in this case yesterday morning.  I wanted
23    that to be as robust on the details as possible to assist
24    the Court in its analysis.  The timing of that as well.
25              I wanted to include a client-specific attestation
```

1  or declaration from Dr. Eric Lofgren, deputy neurologist,

2  on the specific risk factors associated to Mr. Lasane

3  particularly.

4       THE COURT:  I read Mr. Lofgren's report, both in

5  this case and in others.

6       MR. LUKMAN:  So I think, Your Honor, there are, in

7  a nutshell, two grounds for the defense request here.

8       The first ground are the COVID-19 concerns.  I

9  take that very seriously for Mr. Lasane.  I know my office

10 takes that seriously as well as far as personnel concerns.

11      The second issue does involve a lack of ability

12 for confidential client communications.  That's,

13 unfortunately, been the case since the jails went into

14 heightened --

15      THE COURT:  Is he in Orange County or Seminole

16 County?

17      MR. LUKMAN:  He's currently in Seminole County.

18      THE COURT:  I will tell you, Mr. Lukman, I just

19 spent most of the early part of this week going through

20 photographs of the Seminole County Jail, the five separate

21 facilities, five separate rooms they have available for

22 attorney-client meetings.

23      So I'm pushing back on you a little bit there

24 because I don't see anything in the Seminole County Jail

25 that suggests to me that your ability to communicate with

```
 1    your client is compromised to the point where it implicates

 2    his rights.

 3              MR. LUKMAN:  We, defense counsel, were or are --

 4    but I think were prohibited from entering the jail to use

 5    these conference rooms.

 6              I'm aware of what the Court is making mention of.

 7    My colleague in the office submitted an order from the

 8    other district judge in this courthouse discussing these

 9    conference rooms.

10              That was news to me yesterday evening.  As of the

11    filing of this motion to continue, that was not information

12    known to myself or any of our other colleagues.

13              I think that was a case-specific resolution that

14    the other District Court came up with because my colleague

15    had similar issues regarding confidential communication.

16    So that's new and we appreciate that.

17              What's slightly disheartening about that is

18    Seminole County has been able to keep their numbers

19    relatively low with respect to positive tests.  As

20    Dr. Lofgren made mention, in July there were five positive

21    inmate tests.

22              THE COURT:  Can I stop you for a second?  Because

23    I don't want you to hear this as an accusation.  So let me

24    just preface it with that.

25              But these representations get made to me from time
```

```
 1   to time about this is happening at the jail, this is what I

 2   can do, this is what I can't do.

 3           And I will tell you that based on what I saw --

 4   now, you say this is news to you.  I don't know how it

 5   could be news to you.  You have a lot of clients there.

 6   Your office has a bunch of clients in Seminole County.

 7           You know far better than I do, or at least did,

 8   far better than I did what the accommodations are at

 9   Seminole County to see your client.

10           So when you say to me that this is news to you, it

11   may be news to you that these photographs have suddenly

12   been, you know, available, but it's not news to you what

13   the accommodations are at Seminole County.  That's not

14   correct.

15           MR. LUKMAN:  Your Honor, if I may.

16           My office meets regularly on these concerns.  None

17   of my colleagues were aware until yesterday afternoon that

18   the jail was willing to make these accommodations for

19   defense counsel to go inside the jail and have these

20   confidential communications.

21           The rooms may have existed --

22           THE COURT:  Have you ever asked?

23           MR. LUKMAN:  Yes, absolutely.

24           THE COURT:  You've asked and you were told no?

25           MR. LUKMAN:  Correct.  Office-wide.
```

1    Experts on a case-by-case basis for evaluation

2 purposes can make requests.  Attorneys were not to enter

3 the jail.

4    THE COURT:  Well, this is just a philosophical

5 observation.  It's just -- one of the things I'm struggling

6 with here is I'm not sure I ever anticipated that I was

7 going to hear on behalf of an incarcerated, presumptively

8 innocent defendant "I don't want a trial and I don't --

9 maybe I never want a trial."

10    I mean, what you're suggesting, what your proposal

11 is to wait until when?  And with all due respect to

12 Mr. Lofgren -- and I do have respect for him.  I mean, I'm

13 not an epidemiologist.  I certainly am respectful of his

14 professional expertise.

15    That said, I'm not at all persuaded that he's

16 qualified to talk about jury bias and perception and what

17 jurors are going to think about screens.

18    He doesn't have any -- I looked at his resume.  I

19 don't see anything in there that jumps out at me that

20 suggests that he has the slightest idea what he's talking

21 about any more than any other man on the street might.

22    So you don't need advice from me; but my advice,

23 unsolicited, is he should cabin his opinion to something

24 that he knows about and not start talking about whether the

25 jury pool is going to be representative or whether or not

 1   the jurors are going to be biased by having to wear a mask

 2   and face shield.

 3          And he also doesn't know other than what he's been

 4   told by your office what protocols I intend to use in order

 5   to try to provide for the health and safety of the people,

 6   which I'm also concerned about.

 7          So these are not decisions that are just being

 8   made willy-nilly.  As I've said before, the public has a

 9   right to a speedy trial.  The public has a right to a

10   disposition of these charges.  They were brought by the

11   United States.

12          As time goes on, witnesses' memories get weak,

13   evidence degrades, the ability to obtain a successful

14   prosecution is prejudicially impacted.  That affects the

15   interest of the public.  That has to be taken into account.

16          And we have, all of us that are officers of the

17   court -- and certainly I do as a judicial officer -- have

18   an obligation to make sure that we preserve, protect, and

19   defend the Constitution and the constitutional rights of

20   the people involved.

21          Mr. Lasane -- you know, I don't want to do

22   anything that jeopardizes Mr. Lasane's health.  And, again,

23   I'm not an epidemiologist.

24          But I'm not seeing anything which suggests to me

25   that his health is more significantly compromised by giving

1   him his right to a jury trial, which he's entitled to and

2   he's asked for, as opposed to leaving him for some

3   indeterminate period in the Seminole County Jail.

4          I sometimes say when people ask me about it, you

5   know, it's akin to being in Guantanamo.  You're going to be

6   in Guantanamo and never get a trial date, have no idea

7   what's going on?

8          Anyway, I don't mean to get off on that jag except

9   to tell you that nothing is perfect.  And trying this case

10  in these sort of circumstances is probably going to require

11  a lot of flexibility on the part of everybody involved,

12  myself included, the lawyers, trying to make sure everybody

13  stays safe.  Nobody wants to jeopardize somebody else's

14  health.  But indefinitely continuing jury trials is simply

15  not an option.

16         So with all due respect to Mr. Lofgren, on that

17  basis, I'm not inclined to grant your motion to continue on

18  the basis of the COVID health concern.

19         And I think I cut you off.  You said you had

20  another ground or condition to that.

21         MR. LUKMAN:  Oh, I was just going to say I am

22  confident that the access to these conference rooms that

23  the Court made mention of was news to my office as a whole

24  yesterday afternoon.

25         We were consistently denied access beyond the

```
 1   conditions mentioned in my motion.  I just want to be very
 2   clear on that.  It's not personally I was not in the loop.
 3   It was a jail policy that changed, because we were all
 4   rather excited, to be honest, Your Honor, yesterday
 5   afternoon about the opportunity to meet with our clients.
 6        But I was going to suggest that it's slightly
 7   disheartening just because Seminole has been doing a very
 8   good job of keeping their numbers low compared to the
 9   Orange County Jail.  And I think part of that is because of
10   their bubble, so to speak, the protection they've
11   incorporated, although that's posed problems for
12   attorney-client communications, especially privileged
13   communications.
14        But that kind of goes into the segue to answer the
15   Court's question, the second issue was confidential
16   communications at least up until yesterday afternoon.  And
17   Ms. Gable and the Government is correct.  We were gearing
18   up for the trial in this case, save for the Government's
19   emergency motion which the defense did not oppose at the
20   time because of someone's illness.  Now we're trying to
21   protect everyone's health.
22        But I would just suggest while we were gearing up,
23   like any contest, whether by sports analogy and in the
24   courtroom, I don't think it's fair to say because they were
25   prepared and geared up more than six months ago they don't
```

1    need to refresh, regroup, or reconsult on the trial

2    strategy and preparation more immediately preceding the

3    trial date.

4         THE COURT:  Okay.  Well, today is the 20th of

5    August.  This is not a complex case.  I understand it's a

6    significant case.  Don't get me wrong.  It's certainly

7    significant to Mr. Lasane.  But from an evidentiary

8    standpoint, it's not a complicated case.  It's not a

9    document-intensive case.

10        It's also not a case that's going to involve a lot

11   of moving parts in terms of assessing what the Government's

12   case is going to consist of or what the cross-examination

13   will be or, frankly, any of the other things that I

14   sometimes see that warrant an extended period of time to

15   allow you to consult with your client.

16        So I'm not -- I'm confident that you're going to

17   be able to communicate effectively with your client between

18   now and the trial date in order to be prepared to go.

19        I'm looking at the week of September the 7th

20   through the 10th.  Does that pose any problems for the

21   Government, Ms. Gable?

22        MS. GABLE:  It does not, Your Honor.  I believe

23   the 7th may be a holiday.

24        THE COURT:  Yeah.  I just meant that week.  On the

25   7th, is that Labor Day?

```
 1              MS. GABLE:  Yes.

 2              THE COURT:  So first day of that week was the

 3    8th.

 4              MR. LUKMAN:  Your Honor, the defense would request

 5    potential consideration for the latest date in the

 6    September trial term if the Court is denying the defense

 7    motion for a continuance.

 8              (Discussion off the record.)

 9              THE COURT:  How long is the Government's case

10    anticipated to take, Ms. Gable?

11              MS. GABLE:  Your Honor, we anticipate that we have

12    two and a half days of testimony.  I know the defense

13    counsel has a case, and we anticipate that their case will

14    be about a half a day.

15              MR. LUKMAN:  That's exactly right.

16              THE COURT:  So I've looked, Mr. Lukman, to try to

17    accommodate you at a later date, and I just don't have one,

18    unfortunately.

19              So I'm going to set you for jury selection to

20    commence on Tuesday, September the 8th at 9:00.  And

21    then we'll have Tuesday, Wednesday, Thursday, and Friday

22    available to try the case if it does take four trial days.

23              Anything else we can take up in connection with

24    the case?

25              Let's talk a little bit about the mechanics,
```

```
 1   Ms. Gable and Mr. Lukman, just so you'll have a better feel
 2   for what I anticipate the protocol is going to be as far as
 3   jury selection.
 4           We're going to -- jury selection is going to take
 5   longer than usual because we're going to bring the panel in
 6   in smaller groups.  We're going to do jury selection down
 7   in the ceremonial courtroom on 3A so that we have more room
 8   to spread people out.
 9           We have a sound system, different sound system
10   that we'll be utilizing down there that will allow the
11   jurors to use overhead microphones and not have to pass the
12   microphone amongst themselves to respond to the Court's
13   voir dire examination.
14           I think -- don't hold me to the number.  I think
15   we're going to bring these folks up in groups of 19.  I
16   think that's the way the math works out that we can get
17   19 prospects in there at a time.
18           And so we'll go through those groups of 19.  The
19   Government, of course, has six peremptory challenges.  The
20   defense has ten.  My usual practice, as you both know, is
21   to permit backstriking.  We're not going to be able to do
22   that.
23           So we're going to have groups of 19.  We're going
24   to examine each of those groups of 19.  As I said, don't
25   hold me to the number.  It might be 18.  It might be 21.
```

```
 1   But I think it's 19.

 2           Once those groups have been examined, then I'll

 3   call on the defense to go first and exercise peremptory

 4   challenges as it relates to that group of 19.  And we'll

 5   take up challenges of cause obviously first with respect to

 6   that panel, and then we'll move to peremptory challenges.

 7           If in that group of 19, if you do not exercise a

 8   peremptory challenge, then that juror will be seated.  All

 9   right?  So there will be no opportunity to backstrike or to

10   remove somebody from group one once we've moved onto group

11   two.

12           Does that make sense?

13           MR. LUKMAN:  It does.

14           THE COURT:  Okay.  And then we'll continue through

15   the groups until we've got our jury of 12 plus two

16   alternates.  So whether we get that in one grouping, two

17   groupings, or three groupings, we'll move along in those

18   groups of 19 until we've got a jury constituted and

19   selected.

20           Then once the jurors are sworn, we'll move back up

21   here for the trial of the case.  Each of the jurors will be

22   outfitted with a clear face shield.  Everybody in the

23   courtroom will be required to be masked and to maintain

24   social distance.

25           The jurors will be seated in the jury box.
```

1   They'll be spread out a little bit.  And we'll use these

2   plexiglass separation barriers.  We won't use each one of

3   these boxes.  Some of the jurors will be seated in the

4   back.

5           I expect that I will probably inquire of the

6   jurors as to whether they have a preference in terms of

7   their level of comfort.  I don't know if people might feel

8   claustrophobic sitting in those chairs, whether they might

9   prefer to be in the back gallery.  But we will spread the

10  jurors out and/or give them plexiglass covering.

11          The witnesses will all be required to wear masks

12  coming into the courtroom, and they'll have clear face

13  shields.  They'll be permitted to remove their masks during

14  their testimony.  That barrier will remain in place.

15          We will also ask the lawyers to use a clear face

16  shield when they are conducting their examination of

17  witnesses.  The lawyers will be permitted to pull their

18  mask down during the examination of witnesses but not

19  otherwise.  And you have to keep a clear face shield in

20  place at all times.

21          We will not have sidebars.  So if you have an

22  objection that you want to make and you want to approach,

23  you'll need to make that request; but you should anticipate

24  that the request for a sidebar is going to be denied.  I'll

25  give you the option, then, of bringing it up with me during

1    one of the breaks, whether it's the morning break or

2    afternoon break, or maybe take a break if you think it's

3    important enough.

4          But just know that I don't think there's a way.

5    We haven't figured out a way to safely do sidebars, which I

6    don't really do much of anyway as you know.

7          But I'm trying to think what else I can tell you.

8          In terms of deliberations, we're not going to use

9    the jury deliberation room.  We have a couple of separate

10   -- we have three possibilities for deliberations and jury

11   breaks.

12         During breaks, the jurors are going to be able to

13   either utilize the unoccupied magistrate courtroom on the

14   fifth floor.  I've forgotten if that's 5C.  I don't

15   remember if it's 5D or C.

16         We have a magistrate judge's courtroom that's

17   currently unoccupied.  We also have set aside for juror

18   breaks and deliberation the judges conference room on the

19   third floor which is large and has plenty of room for the

20   jurors to maintain social distance while they are

21   deliberating.

22         And then the other option that we have is to clear

23   this courtroom and to allow the jury deliberations to take

24   place inside the courtroom with everyone else locked out,

25   the CSOs posted at all the entrances.  So one of those,

 1    depending on whether or not we have other cases ongoing.

 2            My preference is to use the unoccupied magistrate

 3    judge's courtroom if it's not spoken for because that has

 4    -- it's a way from here.  It gives the jurors a chance to

 5    stretch out, and they can stay socially distanced.  And

 6    they have all the amenities in there they might need.

 7            So questions, Ms. Gable?

 8            MS. GABLE:  Will the Court be supplying the face

 9    shields for the parties?

10            THE COURT:  Yes.

11            MS. GABLE:  And will we be permitted to wear the

12    face shields during opening and closings as well?

13            THE COURT:  Yes.  Obviously, it's even more

14    important that you remain at the podium.

15            And then we're going to have wipes like I have

16    there which I'm going to encourage all of the lawyers to

17    use both coming and going.  So if you would -- in

18    anticipation of somebody else coming to the podium, if you

19    can wipe it down when you leave.  And then I'll try to be

20    vigilant to make sure if somebody forgets that I remind the

21    next person coming to the podium to wipe that down when

22    they arrive.

23            We're not going to allow witnesses to conjugate in

24    the witness rooms outside because it's not large enough for

25    them to safely socially distance.

```
 1              So I'm going to ask the lawyers -- and so,
 2    Ms. Gable, since the Government's witnesses will be
 3    arriving first, just please make sure you stress with your
 4    witnesses that they need to be vigilant about maintaining
 5    their social distance.  And you should have somebody from
 6    your office available to run witnesses in and out from a
 7    more remote spot than we're used to.  So just be aware of
 8    that.
 9              And, Mr. Lukman, obviously when your day comes, if
10    you have witnesses you need to give them similar
11    instructions.
12              I think, but don't know for sure, but I think that
13    Judge Mendoza is going to be starting a case on the
14    31st of August.  You might want to drop in and take a
15    look or have somebody from your office sit in to just see
16    how that goes.
17              I can't promise you I'll do things the same way
18    Judge Mendoza does.  I don't really know exactly how he
19    runs things.  But it might give you some additional
20    information at least in terms of the jurors coming in and
21    the jury selection process, that sort of thing.
22              Because of the need to make sure we provide public
23    access, I don't anticipate closing the courtroom.  I think
24    we'll have -- I don't anticipate a lot of spectators for
25    this case.  If I'm wrong, you all should let me know.
```

```
 1              But my expectation is that I'll be able to safely

 2     divide people by using, as I look to the courtroom, to my

 3     left for spectators or for people that are here on behalf

 4     of the defendant; the right side, the front portion of that

 5     for any jurors that are uncomfortable being in the box that

 6     we need to put in the front in order to maintain some

 7     distance.  And then we'll try to keep those groups apart.

 8              And as I said, I'll have some -- the seats will be

 9     designated back there in the back as to where you can sit

10     and where you can't.  So we'll have -- our staff will come

11     in here and do some of that work before you all arrive.

12              And I know there are things -- I said this to my

13     colleagues and I'll say it to you.  I'm sure you have

14     questions.  I probably don't have answers.  I suspect that

15     there are things that are going to arise that we have not

16     anticipated.

17              We just have to try to deal with those as they

18     develop.  And if I'm forgetting something, I don't know

19     what it is.  But in any event, just know that this is a

20     little bit of uncharted territory for all of us.

21              And I wish more than anything that we were trying

22     cases in the ordinary way with, you know, a large group

23     coming in and with jury selection the way we've always done

24     it.  And I know you all would be more comfortable that way.

25     I would certainly be more comfortable that way.  But it's
```

1    just not an option.

2          MR. LUKMAN:  May I, Your Honor, inquire, follow-up

3    questions?

4          THE COURT:  Yes.

5          MR. LUKMAN:  I'm not sure if I heard the Court

6    correctly, but did the Court anticipate each follow-up

7    witness to sanitize themselves, or was there a designated

8    individual who will be handling that?

9          THE COURT:  I'm going to ask my courtroom deputy

10   to have those wipes available.  And not that she doesn't

11   have enough to do already, but we're going to try to make

12   sure that in between each witness that the area gets wiped

13   down and is disinfected.

14         MR. LUKMAN:  And will the Court be issuing any

15   case-specific written protocols on the docket?

16         THE COURT:  I know Judge Byron did that.

17         MR. LUKMAN:  Right.  And I think that's what

18   Dr. Lofgren was referring to when he was referring to

19   sample protocols, was Judge Byron's order.

20         THE COURT:  Yeah.

21         I'm not opposed to doing it -- well, I'm mildly

22   opposed to doing it for this reason:  Because I don't know

23   exactly what's going to happen.  And if I put it in an

24   order, then I feel like that, you know, it restricts my

25   flexibility to maybe -- maybe as I start doing it, I think

1    this -- I get a better idea.  You know, there's a better

2    way to get this accomplished.

3              So I'll think about it.  Would you like one?

4              MR. LUKMAN:  The defense is requesting it.  Yes,

5    Your Honor.

6              And I understand the Court's position on it and

7    will rule accordingly.

8              THE COURT:  Well, I mean -- and, again, I say this

9    not -- I don't mean it as a criticism.  I have great

10   respect for the Federal Defender's Office and the work that

11   you do as well as the Government.

12             But I surely know that as soon as I issue an order

13   of protocol that Dr. Lofgren, Mr. Lofgren is going to find

14   fault with it because I would find fault with it because it

15   cannot possibly be comprehensive.  And if there were a way

16   to comprehensively ensure everyone's safety other than

17   don't leave your home, don't participate, that's not an

18   option.  So if that's -- you take my point.

19             But I understand that the defense would like to

20   have one because, A, it would give you some idea of what

21   you can count on; and, B, I mean, to be practical about it,

22   it gives you some opportunity to have something to throw a

23   stone at.

24             And I'm not objecting -- I'm not self-conscious

25   about it.  I'm not defensive about having stones thrown at

1    it if you have a better idea or if something in there is,

2    you know -- if there's a better way to do it, I'd love to

3    hear about it.

4        But what I know we can't do is indefinitely

5    continue the criminal justice system as it relates to jury

6    trials.  That, I know I'm unwilling to do.

7        MR. LUKMAN:  Two more, if I may.

8        THE COURT:  Yeah.

9        MR. LUKMAN:  I appreciate the Court's time and

10   patience with these.

11       THE COURT:  Sure.

12       MR. LUKMAN:  This is a good segue of people coming

13   in.  I know the Court in its prior order at doc 59 sua

14   sponte review of the case and continuance acknowledged its

15   concern for ensuring an appropriate cross-section.

16       And the defense would move, unless the Court

17   intended to do this -- what's the status of questionnaires

18   being disclosed to the defense?

19       THE COURT:  Yeah.  Good question.

20       So the COVID questionnaires are being returned --

21   I can't remember the number of days.  But they come back --

22   they can either be done electronically or they can be

23   returned manually.

24       Then what Jury Assembly is doing, then, is they're

25   bringing all of those other than the standard excusals

```
 1   which would be the statutory excusals, over 70 years old,

 2   taking care of -- child care problems, but the answers to

 3   the COVID questions are then going to the presiding judge.

 4           I personally have no problem making those

 5   questionnaires available to the defense and the Government

 6   so that you all can see who I have deferred, but I don't

 7   intend to have a hearing to go through each of those COVID

 8   deferral requests.  I'm going to make a judgment as to

 9   whether or not I think those people should be deferred

10   based on what's in their questionnaire.

11           But you all can look at them and obviously if you

12   have an objection or if you think I've deferred somebody or

13   not deferred somebody inappropriately, I think you should

14   have an opportunity to make a record of that.

15           I'm not going to let you -- what I'm going to

16   instruct Jury Assembly to do is when those things are

17   returned to give you all an opportunity to come down and

18   inspect them.  But I'm not going to make copies of it

19   because I want to balance the privacy of the jurors,

20   especially those jurors that are not being selected, that

21   are being deferred, they're not going to be on your panel

22   anyway.

23           So the only objection would be that you think I

24   deferred somebody who should have been on the panel who

25   might have impacted or might implicate the representative
```

```
 1   nature or the demographics of the panel.  I can certainly

 2   see that you might be interested in whether there are more

 3   African-American deferrals or more elderly deferrals or

 4   more Asian deferrals.  And, again, that's in the category

 5   of -- we have no idea.  Frankly, we'll have to see.

 6          But my own view is that I think you probably need

 7   access to that information in order to make an informed

 8   assault, for lack of a better word, on the representative

 9   makeup of the panel.

10          So we'll see.  It may turn out not to be an issue,

11   but if it is an issue -- so what I'm going to do is I'm

12   going to instruct Jury Assembly to let me know when they

13   anticipate the summons going out for September the 8th.

14   It will be pretty quickly here.

15          I don't know if you know off the top of your head.

16          THE DEPUTY CLERK:  They should do it by the end of

17   this week.

18          THE COURT:  So the summons will go out likely by

19   the end of this week.  And then as soon as the COVID

20   responses are available and I've had a chance to review

21   them, I'll ask Ms. Acevedo to give you a call and let you

22   know that they are available at Jury Assembly.  And then

23   you can come over and inspect the requests for deferral

24   that are based on COVID.

25          We've modified the questionnaire a little bit as
```

1    of last week based on my first experience with some of

2    those coming back.

3            I know you all have seen, I suspect, the original

4    questionnaire.  Am I correct on that?

5            MS. GABLE:  Yes.

6            THE COURT:  Mr. Lukman?

7            MR. LUKMAN:  I believe so.

8            THE COURT:  Okay.  So it's nothing drastic in the

9    change.

10           The only change is we added -- question three

11   asked the jurors to answer yes or no as to whether they

12   suffered from a pre-existing condition that put them at

13   higher risk of COVID.  And it was just a yes or no.  It

14   didn't ask them what.

15           So the concern was that as some of these things

16   came in that many of these jurors probably really don't

17   know whether their pre-existing condition is something that

18   puts them at higher risk.  They might think it is or they

19   might feel like that it is something that disqualifies

20   them, that doesn't disqualify them.

21           And I'm using "disqualify" based on the CDC

22   guidelines that would actually put them at great risk.

23           So we added 3-A to ask them to tell us what it is.

24   So if you're asthmatic or if you've got COPD or if you're

25   diabetic or if you had a lung transplant, tell us what it

```
 1   is that you think puts you at higher risk.

 2          And then we've also added a question, I think it's

 3   now question number five, where we ask the jurors to tell

 4   us whether they were requesting a deferral based on a yes

 5   answer.

 6          Because when I went through the last batch, I

 7   don't want to say it was clear, but it was at least -- the

 8   question arose in my mind with respect to some of the

 9   answers, people answered yes -- for instance, I live in a

10   home with someone that's vulnerable; but they weren't

11   really asking to be deferred, if you take my point.

12          Yes, I live with -- I live with my parents who are

13   over 65, but I'm not asking to be deferred from jury duty.

14   We didn't really give them that option.  So we added a

15   question that says, essentially, if you did answer yes to

16   any of these questions, are you asking to be deferred based

17   on COVID concerns, yes or no.  So somebody could answer

18   yes, I live in a home with vulnerable people; but no, I'm

19   not asking to be deferred for that.

20          So those changes.

21          And I don't know if you have that available.

22   Ms. Acevedo may be able to print one of those out and give

23   it to you before you leave today if you'd like to have

24   that.

25          MR. LUKMAN:  That would be great, if possible.
```

```
1                MS. GABLE:  Yes.

2                THE COURT:  And the new one will be the one that's

3      going out?

4                THE DEPUTY CLERK:  Yes.

5                THE COURT:  Okay.  So we're not going to -- we

6      have some that are already out that are the old form.  But

7      obviously the ones that are out are out.  But everything

8      that's going out from this point is going to use this

9      slightly modified one.

10               MR. LUKMAN:  Your Honor, my third and final

11     inquiry on final protocol pertains kind of specifically to

12     defense table counsel communications.

13               THE COURT:  Right.

14               MR. LUKMAN:  I'm not sure if the Court had any --

15     I know it's a little bit of play it by ear, but are there

16     any anticipated protocols for how we'll distance, we'll

17     communicate while maintaining confidentiality and so forth?

18               THE COURT:  Yeah.  I'm going to give you the

19     opportunity, Mr. Lukman, to bring to my attention if you

20     have a need to communicate with your client during the

21     course of the proceedings.  And I will make sure that I

22     make that happen in a way that's confidential.

23               The biggest challenge obviously are the --I guess

24     in the good old days you being able to lean over and

25     whisper to your client or have your client lean over and
```

 1   whisper to you.  That's probably not going to be possible

 2   unless you know the lawyer and/or the client want to

 3   proceed that way.  And everyone is going to be masked.

 4          But I'm going to be making some remarks to the

 5   jurors during the jury selection process pointing out to

 6   them that some things are different and we'll have people

 7   sitting in places where they wouldn't ordinarily sit.  And

 8   Mr. Lasane's lawyer may not be sitting right next to him.

 9   It doesn't mean you should take anything from that except

10   that we're trying to keep people safe.

11          And it may be necessary for me to interrupt things

12   from time to time to let the Government talk to her

13   representatives or to let the defense talk to Mr. Lasane.

14          So things are going to go maybe a little slower

15   than they might expect, and I need their patience and

16   understanding with that.  So I'm going to do whatever I can

17   to try to lay the groundwork for that going forward.

18          I guess the short answer to your question is, I

19   don't know a good solution to that problem.  I've

20   entertained several ideas.

21          This sort of separation panel maybe being placed

22   between your chairs and the chair of the defendant, I'm not

23   sure I would want that or not if I were a defense lawyer.

24          So I don't want to be presumptuous and say, you

25   know, I mean, we -- if you or Ms. Gable, if you would like

```
 1   to have one of these separators so you can separate
 2   yourself or your agent, my anticipation was that I would
 3   have the client sitting at one table and the lawyer sitting
 4   at a different table so that you maintain some distance but
 5   there was not actually a physical barrier between you.
 6            The client can obviously and these case agents can
 7   obviously write notes and pass notes.  It's not perfect
 8   but -- so that's kind of in the category of I don't really
 9   know yet.
10            But I appreciate the fact that if I were in either
11   of your shoes I would be a little bit worried about how I
12   was going to talk to my folks during the course of the
13   trial.
14            All I can tell you is that I'm going to be as
15   flexible as I can be to try to accommodate you if something
16   arises and you feel like you need to have a conversation
17   with them and you can't do it without interrupting the
18   proceedings, then we'll interrupt the proceedings.
19            MS. GABLE:  Your Honor, I would prefer to have the
20   case agent at the same table.  We've been having hearings
21   and operating that way.  We wear masks.  And it's been
22   fine.
23            THE COURT:  Okay.  That's fine.
24            I'm not going to require -- the only thing I'm
25   going to require is that you maintain social distance.  You
```

1    can do that sitting at one table.

2         The other thing that I want you all to know is

3    that if there's something that you want me to -- that

4    you're concerned about in terms of the appearance or

5    something that's maybe hanging out there that's not been

6    addressed, just tell me about it.  Unless I think it's

7    inappropriate or wrong, you know, no reason I wouldn't do

8    it.

9         I'm going to do everything I can to try to think

10   of everything, but two minds are better than one.  If you

11   all think that something should be addressed with the panel

12   that I haven't taken up with them, then just raise your

13   hand and let me know.  Again, unless I think it's not

14   appropriate, there's no reason I wouldn't do it.

15        MR. LUKMAN:  I might have another inquiry.

16        Heaven forbid --

17        THE COURT:  I started to warn you when you said

18   this is my last question.

19        MR. LUKMAN:  I know.  Rookie mistake.  I jinxed

20   myself.

21        Heaven forbid, if any circumstances happen to

22   worsen, if access of a jail changes from what it is now, if

23   Mr. Lasane who has some brief symptoms were to be diagnosed

24   or were to get sick, does the Court want a written motion

25   to reach out to the deputy or what's the Court's preference

```
 1    for any updates on any potential but hopefully not wrenches
 2    in the gears?
 3              THE COURT:  Well, so the answer is I would need
 4    both.  If you're looking for a continuance, you're going to
 5    need to file a written motion and you're going to need to
 6    articulate your grounds and probably legal memorandum in
 7    support of your request.
 8              That said, if you're working on your motion, I
 9    would always be appreciative if you call my courtroom
10    deputy and said we're going to be moving to continue.  I
11    don't have the motion finished yet but it's coming.
12              The same for the Government as well.
13              MS. GABLE:  Should we report directly to
14    Courtroom 3A on the first day of trial?
15              THE COURT:  Yes.  Courtroom 3A on the first day of
16    trial.
17              MS. GABLE:  But we will be trying the case here.
18              THE COURT:  Correct.
19              We're going to do jury selection only there partly
20    -- for two principal reasons.
21              One is that we have more room there.  We can
22    spread people out.  We're going to have -- the district
23    judges are all -- we're trading off on jury selection days
24    so that we're not picking a jury on the same day so that we
25    can use 3A.
```

```
1              The other advantage is that we can take jurors, if
2     need be, up the stairway to 3A and not have to put them in
3     the elevator.  Once they're selected, obviously then they
4     can ride the elevator to be here.  But we can bring the
5     group of 12 to 14 up much more efficiently by spreading
6     them out as much as we can in several groups of 20.
7              All right.  As I said, I'm sure there are more
8     questions, but we've been through a lot of them today.
9              So I'll look forward to seeing you all.
10             And as I said, you might want to pay attention
11    with what happens with Judge Mendoza's panel so we'll have
12    some idea.  He got the short straw, I guess, being the
13    out-front guy.
14             All right.  I'll see you all then, if not before,
15    the morning of the 8th in Courtroom 3A for jury
16    selection.
17             MR. LUKMAN:  Your Honor, may the record reflect
18    the defense's objection respectfully to the Court's denial
19    of the motion?
20             THE COURT:  Yes, it will.
21             (Proceedings adjourned at 10:24 a.m.)
22                          *****
23
24
25
```

```
 1                    C E R T I F I C A T E

 2

 3          I certify that the foregoing is a correct

 4     transcript from the record of proceedings in the

 5     above-entitled matter.

 6

 7     August 21, 2020

 8

 9         s\  Amie R. First
       _____
       Amie R. First, RDR, CRR, CRC, CPE
10     Federal Official Court Reporter
       United States District Court
11     Middle District of Florida

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```